490 So.2d 294 (1986)
Herbert Joseph SCHOUEST, Sr.
v.
Bruce STIPELCOVICH, Herman Quick, Larry D. Williams, and William Mabry and the ABC Insurance Company.
No. 85-CA-346.
Court of Appeal of Louisiana, Fifth Circuit.
May 12, 1986.
Rehearing Denied July 17, 1986.
*295 James L. Donovan, Donovan & Lawler, Metairie, for Herman Joseph Schouest, Jr., plaintiff-appellant.
Claude D. Vasser, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for Bruce Stipelcovich, Herman Quick, Larry Williams, and William Mabry, defendants-appellees.
Before BOUTALL, CURRAULT and GAUDIN, JJ.
BOUTALL, Judge.
This is a tort suit against executive officers by a worker for damages resulting from an occupational disease. From a judgment in favor of the defendants, the plaintiff has appealed.
Herbert J. Schouest, a painter and sandblaster, sued four management employees of his employer, J. Ray McDermott & Co., Inc., alleging their negligence caused him to contract silicosis and further aggravated the disease. Schouest is a 48 year old man with a third grade education who is virtually illiterate. He first worked as a sandblaster four years for Ike Haggard, a small company in Harvey that was bought by McDermott in 1969. He was then employed by McDermott in the fabrication division as a painter and sandblaster until March, 1979, when he stopped working. He was carried on "personal illness leave" until he was terminated upon filing suit in August 1979. McDermott began paying and has continued to pay worker's compensation benefits and medical expenses.
The petition alleges that Schouest contracted silicosis in 1969 and that Bruce Stipelcovich, general manager, Herman Quick, general superintendent, Larry D. Williams, safety manager, and William Mabry, yard section superintendent, were negligent in the following respects: failure to provide a safe place to work, failure to furnish proper protective equipment, failure to promulgate safety rules and regulations, failure to inform the plaintiff that he had silicosis as soon as they learned of the condition and permitting him to work in free silica after receiving the diagnosis.
The trial court held for the defendants and stated that 1) the plaintiff had failed to prove, by a preponderance of the evidence, that the named defendants had failed to provide a safe place to work; 2) Schouest had probably contracted the disease before being employed by McDermott; 3) Schouest was informed by a physician in 1974 that he had silicosis and should not return to a silica environment; and 4) as the damage was done as of 1974, any negligence by the defendants after that time was not a cause in fact of the disability.
Issues raised by the appellant are 1) whether the named defendants owed the plaintiff a duty to provide a safe place to work, 2) whether in fact they failed to provide a safe place to work, and 3) whether the defendants' failure to monitor properly the plaintiff's medical condition was a cause of his disability and damages.
Silicosis is a chronic disease that results from inhaling dust with a high concentration of silica, characterized by fibrosis in the lungs, and eventually leading to disability. Susceptibility to the condition varies among individuals. The court in Faciane v. Southern Shipbuilding Corp., 446 So.2d 770 (La.App. 4th Cir.1984), provided the following information as to the progression of silicosis, at 772:
"The condition is progressive in nature in the sense that once the disease process begins, it continues to worsen even when the victim is removed from exposure to silica particles. There is no known cure for this disease. Those suffering from silicosis not only experience decreased pulmonary function, but are more vulnerable to diseases of any type, due to lowered body resistance."
The testimony indicates that Schouest's condition came to the attention of Larry *296 Williams, the new safety manager for the fabrication division, in mid-1978, when the first aid station at the plant reported Schouest had had frequent complaints of colds, chest problems, and sinus problems. He continued to monitor Schouest's first aid record and requested his 1977 x-ray report from the clinic which had for many years performed pre-employment physical examinations of all McDermott employees and annual x-rays of the sandblasters. Noting that the August 10, 1977 x-ray showed "nodular infiltrative changes both lungs," he became concerned about the plaintiff's working in the silica environment. On November 20, 1978 chest x-rays of Schouest showed, "Pulmonary fibrosis. No increase. Advise pulmonary workup and advice re future occupation." Pulmonary studies were performed by Dr. Thomas Grimstead on referral from Dr. Sam Logan, who had followed Schouest off and on for a period of years at the Logan-Nelson Clinic, formerly the West Bank Clinic. Dr. Grimstead's letter to Williams dated January 9, 1979, stated that the findings were compatible with silicosis and he recommended that Schouest, along with two other men examined, be removed from sandblasting.
Although it is impossible to pinpoint the time when Schouest contracted the disease, medical reports accepted into evidence clearly show abnormal findings on x-rays as early as August 22, 1970, when "early fibrosis" was reported. A letter from Dr. Sam Logan to Jim Carroll (chief of safety), dated March 5, 1974 states the following, regarding Herbert Schouest:
"On review of a chest X-ray taken March 5, 1974 on the above, I find evidence of pulmonary fibrosis. I have re-examined his annual X-rays back to 1969. The condition began to be obvious in 1971, and it has not changed in character or degree very much since then. Todays film showed only a small increase since 1971.
"However, I recommend he be removed from exposure to dust permanently. His breathing capacity should be checked annually with the spirometer, and he should have annual chest x-rays as long as he lives."
Thereafter all the x-ray reports except one in 1975 contained a warning against dust. Clearly, the silicosis condition developed over a period of years and the company was fully informed in 1974.
Duty owed to plaintiff
The employer owes a general duty of reasonable care to his employees, including suitable physical facilities, safety appliances, and instruction as to safe practices and occupational dangers. Malone & Johnson, Louisiana Workers' Compensation Law and Practice, v. 13, section 2.
Although the workers' compensation statute has provided from its inception that its benefits are an employee's exclusive remedy against his employer, prior to October, 1976 tort suits were permitted against executive officers where their ordinary negligence was alleged. After the enactment of Acts 1976, No. 147, Sec. 1, executive officers could be sued by injured workers only for an alleged intentional tort. Accordingly, in this case, two standards for liability are applicable.
The appellant's position is that all the defendants were on the site frequently if not daily, and had responsibility to stop any unsafe practices and, if they delegated responsibility, to see that the subordinates fulfilled their duties. The appellees contend that Stipelcovich, Quick, and Mabry had no personal duty toward Schouest. They further note that Larry Williams, who was in the safety department only a short time during Schouest's work period, took positive steps regarding management of his illness. Any other safety department employees who might have been liable, including the head, Jim Carroll, were not named in the suit.
Other than Larry Williams, none of the defendants admitted having personal responsibility for safety of the sandblasters, specifically regarding monitoring of medical reports, warning of silicosis, and checking the air-fed hoods used by the men. *297 Bruce Stipelcovich testified that as over all manager he delegated to the general superintendent (Quick) his responsibility for carrying out safety policies regarding hourly workers. He explained that the safety department was a unit, separate from the fabrication division, which set up safety policies. His own duties as manager were administrative and concerned financial and operational matters. While he toured the yard once a week, it was mainly to see first hand the progress of the jobs that were under way. While he had the authority to hire or fire or stop any unsafe practices personally, he believed in acting through the chain of command.
Herman Quick, general superintendent of the fabrication division, testified that he was in the yard two to four times daily. His function was assigning work to the crews and determining how much work the division could do. Although he acknowledged that Stipelcovich must have been truthful in stating that he delegated safety responsibility to the general superintendent, he had no specific responsibility. According to his testimony, only the safety department was responsible for monitoring medical reports or selecting safety equipment. He denied having been aware of possible silicosis among the workers, until informed of Schouest's condition.
William Mabry testified that his responsibility as fabrication superintendent was to oversee the fitters and welders. He had only limited responsibility for the sandblasters, as they were under their own foreman who reported to him when problems other than safety arose. He denied any familiarity with the sandblasting operation, despite having worked in the yard for a full shift each of his work days for twenty years. He did not know whether sandblasters used respirators and had never observed sand on their clothes at the end of a work day. The only safety duty he took upon himself, apparently, was attending safety meetings. Medical reports went to the safety department and he believed they would have informed him of any problem.
We believe that Stipelcovich had no personal duty to Schouest, as his management duties removed him from direct contact with the men. We find the testimony of both Quick and Mabry to be evasive. We find it incredible that neither Quick, who admitted being in the yard several times a day and whom Stipelcovich stated was delegated safety responsibility, and Mabry, who worked in the yard all day, had no responsibility for the safety of their employees and believe that they did have a duty to Schouest.
Failure to provide safe place to work
The appellant alleges that the protective hoods provided to the sandblasters were inadequate in that the company failed to supply a sufficient number of contoured shields to protect the primary lens on the helmet. Ricocheting sand would very quickly mar the shields so that the workers could not see adequately and had to be replaced, sometimes several times in a day. Schouest and his fellow workmen testified that it was common practice to use tape and square pieces of plastic supplied by the company instead of the regulation contoured replacement shields. The defendants all denied having observed this practice and Williams stated that while using tape reinforcement alone was harmless, using plastic squares violated the integrity of the hood and ruined the seal, allowing sand to come in. Another practice reported by Schouest, plugging up a leak at the entry of the air hose with "Splashon," was equally against regulations. The plaintiff's employee witnesses all testified that the hoods provided were no better or worse than any others they had used on other jobs or experimentally for McDermott. Some sand leaked through all. While the workers complained that if a damaged hood was needed it took weeks to get a new one, the McDermott witnesses testified that the supply house that furnished the hoods was located on or next to the plant site and an order could be filled in a matter of an hour or two. There was no stinting on the part of management as to equipment. This factual *298 determination is a credibility call, and we are inclined to believe the testimony of the defendants.
Failure to monitor medical condition.
The appellant asserts that regardless of whether or not Schouest contracted silicosis prior to 1969 when he was employed by McDermott, by retaining him in the environment the defendants aggravated or exacerbated his condition. Again, the defendants reply that since it was not the three managers' job but that of the safety department, they are not liable. Larry Williams, being held to the post-1976 standard of executive officers' liability, may only be found liable if he intended harm or knew that harm was likely to result.
The unrebutted testimony of Dr. Robert Norwood Jones, a specialist in internal medicine and pulmonary diseases and professor at Tulane University Medical Center, was that it was harmful, in fact impermissible, to expose a person whose x-ray shows silicosis to respirable silica, even to small increments of exposure which would not hurt one who did not have the disease. As to Schouest himself, Dr. Jones found that his lung function was unimpaired as of December 5, 1983 but silicosis showed up clearly in the x-rays. He could not predict that the disease would progress, which it normally does, or if so how rapidly. But as long as he had an abnormal x-ray he must not sandblast.
The failure of an employer to report to a prospective employee the results of a pre-employment physical examination was considered by the Supreme Court in Dornak v. Lafayette General Hospital, 399 So.2d 168 (La.1981). The court held that the employer owed the employee a duty to inform her of a tubercular condition discovered in the examination and said, at 170:
"... While we do not consider that the hospital had any obligation to give plaintiff a pre-employment physical examination, once it undertook to do so and subsequently employed her, she was entitled to and did rely upon the expectation that she would be told of any dangerous condition actually disclosed by that examination,..."
We believe that the Dornak holding applies to the facts before us, in that by undertaking a program of periodic x-rays of its sandblasters, the employer has incurred a duty to report any abnormal findings to the employee. We further extend the rule to a duty to act upon the advice contained in the physicians' reports.
With the above framework in mind, we now consider the liability or not of each of the four defendants. Bruce Stipelcovich is not liable because he had only over all supervision of the fabrication division, had specifically delegated his duties to the general supervision of Herbert Quick, and had no direct contact with the workmen. In the case of Quick and William Mabry, we find that they have breached a duty to the plaintiff, because they did have direct contact with him and, despite their denial, they did have responsibility for the employee's safety. They were aware the men were being examined regularly and should have made it their business to find out whether there were questionable results on any of the men.
As to Larry Williams, as noted above, he may only be found liable for an intentional tort. There is some testimony indicating that he may have delayed getting Schouest reevaluated once he became concerned about the x-rays, and there are conflicting reports as to whether Schouest was removed completely from blasting and from the sandblasting area from January 9, 1979 when Williams received the medical report, until he quit work in March, 1979. Even if the allegations were true, we cannot construe Williams' acts of omission to be intentional torts.
The appellees defend on the basis of Schouest's contributory negligence, by misusing the hood and by failing to heed a warning in 1974 that he must stop sandblasting. While in a tort case the defense of contributory negligence is appropriate, the workman is given some leeway in an *299 executive officer suit. The guidelines are summarized in Miller v. Employers Mutual Liability Ins. Co., 349 So.2d 1353 (La. App. 2nd Cir.1977), at 1362, as follows:
"Emerging as criteria for determining an employee's contributory negligence are: (1) relative knowledge of the danger by the supervising employee and the injured employee; (2) relative control over the employee's situation; (3) the degree to which the employee's conduct is voluntary on his part; (4) alternatives available to the employee; (5) obviousness of the danger; and (6) relative ability to eliminate the danger."
See also Martinez v. U.S. Fidelity and Guar. Co., 423 So.2d 1088 (La.1982).
The testimony as to whether Schouest had been informed earlier of his condition is conflicting. The plaintiff's witness, Dr. Jones, read at trial from the report of a deceased Tulane physician, Dr. Morton Ziskind, who examined Schouest in 1976. According to Dr. Ziskind's report, Schouest reported to him that a doctor told him in 1974 he had an abnormal chest x-ray and should stop sandblasting. At trial, Schouest said he did not recall telling Jones or Ziskind of a previous report. He said:
"A.... Why should I tell him that?
"Q. Because you would have known in 1974 that you shouldn't continue to be a sandblaster if you told him that, wouldn't you?
"A. Well, at that point there, I had a family I had to you know, support and all and I was making good money and all and I didn't want to jeopardize my job."
Schouest admitted having heard of silicosis and assumed sandblasting was hazardous since he was sent for an x-ray every year. We concur with the point of view expressed in Blakeney v. Tidewater Compression Service, 463 So.2d 914 (La.App. 2nd Cir. 1985), writ den. 467 So.2d 533 (La.1985), as follows at 920:
"A workman whose duties require that he work in hazardous circumstances who is injured while doing his best to discharge those duties is not guilty of contributory negligence even though he is fully aware of the risk of injury to which he is subjected while performing his work. O'Keefe v. Warner, 288 So.2d 911 (La.App. 1st Cir.1973)."
Accordingly, for the reasons hereinabove expressed, we find that there is liability on the part of the general superintendent, Herman Quick, and the yard section superintendent, William Mabry, for a portion of the damages suffered by Herbert J. Schouest. We now pass to a consideration of the fixing of said damages.
Amount of Damages
Further examination of the record reveals that there is insufficient information contained therein that would permit us to render a just, legal and proper decision relative to the amount of damages. C.C.P. art. 2164.
The medical evidence indicates that the acts and omissions of these two defendants, Quick and Mabry, have caused some aggravation and progression of the lung condition suffered by the plaintiff. At the same time there is also some evidence as to the damage and losses suffered by the plaintiff in general. However, there is insufficient detailed testimony that would permit us to fix in a just and equitable manner the relationship between the acts of omission and commission by the co-defendants and the monetary value of the damages suffered.
We refer to the case of Gonzales v. The Zerox Corporation, 320 So.2d 163 (La. 1975), and we subscribe to the principle that when the appellate court has all of the facts before it, it should render judgment and not remand. Our difficulty here is that we do not have all of the facts in the record upon which we could render a fair and just decision. The only decision that we can render which would do justice between the parties is to remand this matter to the district court for further evidence on the issue of the amount of damages for which they are liable.
*300 Decree
For the reasons hereinabove expressed, we affirm the judgment of the trial court in its dismissal of plaintiff's suit against Bruce Stipelcovich and Larry D. Williams. We reverse that portion of the judgment which dismissed the suit against Herman Quick and William Mabry and as to those defendants we render judgment finding them to be liable to plaintiff for damages for aggravation of his condition. We remand this matter to the trial court for further proceedings to determine the amount of damages for which they are liable. All costs of these proceedings relating to Bruce Stipelcovich and Larry D. Williams shall be borne by plaintiff. All costs relating to Herman Quick and William Mabry shall be borne by the defendants.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.