503 So.2d 120 (1987)
Dr. Katherine KNIGHT
v.
Vickie MILLER, et al.
No. 86-CA-479.
Court of Appeal of Louisiana, Fifth Circuit.
February 9, 1987.
*121 James S. Thompson, Cynthia A. Bacher, New Orleans, for defendant-appellee.
Morton H. Katz, Nahum D. Laventhal, New Orleans, for plaintiff-appellant.
Before GAUDIN, KLIEBERT and WICKER, JJ.
WICKER, Judge.
This appeal arises from an automobile accident between Dr. Katherine Knight (Knight), plaintiff/appellant and Vickie Miller (Miller), defendant/appellee which occurred in Metairie, Louisiana on November 3, 1983. Knight settled with Miller for $22,000.00 in exchange for a full release of Miller and her insurer, Government Employees Insurance Company. Knight, in an amended petition, had also sued her uninsured/underinsured motorist carrier, State Farm Mutual Automobile Insurance Company (State Farm). A jury trial proceeded against State Farm. The jury returned a verdict in favor of State Farm and the trial court subsequently made the verdict the judgment of the court. Knight now appeals. We reverse.
On November 3, 1983 Knight was operating her vehicle on Conlin Street in Metairie, Louisiana when she was struck from the rear by Miller's vehicle. There was no evidence at trial to show any comparative negligence on the part of Knight. Counsel stipulate that a rear-end collision did occur; however, Miller asserts as a defense that she experienced a sudden, unforeseeable loss of consciousness as a result of an epileptic seizure. Miller cannot recall anything about the accident itself.
Appellant specifies the following errors:
1. That the jury erred in finding that the defendant, Vickie Miller was not negligent, and
2. That the jury erred in failing to award Knight damages.
In Tidwell v. Ocean Systems, Inc., 356 So.2d 466, 468 (La.App. 1st Cir.1977) the First Circuit correctly noted that "As a general rule, when a following vehicle collides with the rear of the preceding vehicle, the following vehicle is presumed to be at fault, and he bears the burden of exculpating himself from the inference of negligence. See L.S.A.-R.S. 32:81." See also Jones v. Meinke, 357 So.2d 838 (La.App. 4th Cir.1978); Leftwich v. Molony, 322 So.2d 438 (La.App. 4th Cir.1975); Eubanks v. Brasseal, 310 So.2d 550 (La.1975).
It is undisputed that Miller's vehicle collided with the rear of Knight's vehicle, the preceding vehicle. There is also no evidence indicating that Knight was negligent in any way for the accident. Therefore, *122 the only means Miller has to exculpate herself is to plead the unforeseeable loss of consciousness.
Miller testified that she first learned that she suffered from epileptic seizures when she was 10 years of age. At that age she was "semiconscious" and nonresponsive for 20 minutes. She was hospitalized and subsequently treated for epilepsy by Dr. Frederick Boykin. She stated that when she was 18 years old Dr. Boykin increased her dosage of phenobarbital from 15 milligrams in the morning to 30 milligrams and from 30 milligrams at night to 60 milligrams. She reported that at age 18 her seizures occurred twice a year.
In 1977 or 1978 Miller and her husband testified that they left the Shreveport, Louisiana area where she had been under the care of Dr. Boykin and moved to the New Orleans, Louisiana area. She did not consult a neurologist or any other specialist in epilepsy in the New Orleans area from the date of her move until after her accident on November 3, 1983. She also admitted that she had no blood work done from 1978 until 1983 to determine the sufficiency of her dosage.
She further testified that around Labor Day of 1983, her seizures had increased from once every six months to twice a month. She asserts, however, that her seizures were of the "speech arrestee" type in that she would not lose consciousness but would only become mute. She stated that the "speech arrestee" seizure she had in the hospital the day after the accident was typical of what she had always had. This seizure was observed on November 4, 1983 by Dr. Derbes of Tulane Medical Center and documented in her medical record. The seizure was described by Dr. Derbes as a partial complex seizure which lasted approximately three to five minutes in which she "slowly regained consciousness."
She admitted, however, that during the period preceding the accident when the seizures increased she would try to take precautions to have someone with her in the vehicle. However, on the date of the accident she drove alone.
Although Miller denies a loss of consciousness during seizures except for the date of the accident, she evidently could not evaluate her seizures. In fact, she admitted that her parents had to tell her when she had a "speech arrestee" seizure since she did not know about it.
After her stay in the hospital following the accident her dosage of phenobarbital was increased from 30 milligrams in the morning to 60 milligrams and from 60 milligrams at night to 120 milligrams by Dr. Leon Weisberg. After hospitalization her physicians advised her not to drive until she had been reevaluated one month later by Dr. Weisberg.
Dr. Richard Miller, Miller's husband, a psychiatrist, also testified. He stated that from 1977 until 1983 he continued her phenobarbital medication. He also testified that in his medical practice he has never dealt with patients having an AV malformation as described by Dr. Weisberg to be the problem with his wife.
He was aware of the increased seizure episodes and discussed it with his wife. He attributed these to stress during that period, but it was decided that if they continued she should seek medical advice. He was not concerned about her driving, however.
He also testified that while he has observed seizures during which only her speech was affected there were other seizures his wife had which she would inform him that she had at a later date.
Moreover, he testified that around Labor Day that year her seizures increased. However, his father had become ill from cancer and his wife did not have time to seek further workup because of the serious family illness.
Dr. William Albert Martin, a neurologist, the plaintiff's witness, testified that he had reviewed Miller's medical records. He also testified that a person having the type of seizures Miller had in the hospital would probably not be in good control of the vehicle during that time. In his opinion, a person who was having two seizures per month was not in good control of their seizures.
*123 He further testified that the usual recommended adult dose of phenobarbital if no other anticonvulsive medication is taken is 180 milligrams a day.
Dr. Leon Weisberg, a neurologist, testified that he treated Miller subsequent to the accident. He stated that he had reviewed Miller's medical records from Drs. Boykin and Embry.
He described a "speech arrest seizure" as one in which the person is aware of the environment, yet cannot communicate by speaking for a short period of time.
In his opinion, he believes that on the date of the accident she had a seizure which interfered with her ability to respond to the environment  something completely different from a "speech arrest seizure".
On direct examination he testified that he did not believe there was any way Miller could have predicted blacking out on the date of the accident. However, on cross examination, he admitted that he had never seen Miller having a seizure of any type and was basing his opinion regarding foreseeability on her description of a "speech arrest seizure". He also testified that if Miller were typically having the types of seizures observed in the hospital his opinion regarding foreseeability would be different. As noted previously, Miller testified at trial that the hospital seizure was a typical seizure.
He also testified that she should have seen a physician when the seizures began increasing to twice a month.
In Gambino v. Lubel, 190 So.2d 152 (La. App. 4th Cir.1966), writ denied 249 La. 834, 191 So.2d 639, 640, 642 (1966) the Fourth Circuit dealt with a negligent action against a diabetic who lost consciousness. In the Lubel case, the defendant knew he was a diabetic who was subject to insulin attacks and who realized as he was driving his car that he was beginning to have an insulin reaction. The court noted that even realizing the onset of the reaction, he failed to stop his car. In the Lubel case the court found that the defendant had been grossly negligent. In discussing the standard of care owed by one who is afflicted the Lubel court held that "[a]n afflicted person is held to the standard of care of the ordinarily prudent man which the law has established for everybody. To attain this norm he may have to put forth a greater effort for his own safety, and the safety of others, than one not disabled." [Emphasis supplied] 190 So.2d 152 at 156.
In Deason v. State Farm Mutual Automobile Insurance Company, 209 So.2d 576 (La.App. 3rd Cir.1967) the Third Circuit explained that:
[t]he weight of authority in the United States is that an operator of a motor vehicle who, while driving, suddenly loses consciousness from an unforeseen cause, and is unable to control the vehicle, is not chargeable with negligence. Stated differently, sudden or momentary loss of consciousness while driving is a complete defense to an action based on negligence if such loss of consciousness is not foreseeable. [citations omitted] 209 So.2d 576 at 577-78.
In the Deason, supra case, however, the defendant had never been treated for a heart condition. The autopsy revealed that the defendant died from a heart attack. The Deason court held that the accident was unavoidable and found the defendant to be free from fault.
However, in Martino v. Aetna Casualty and Surety Company, 351 So.2d 204 (La. 4th Cir.1977) writ denied 353 So.2d 1048 (1978) the Fourth Circuit considered the issue of foreseeability. It held that "when a driver suddenly loses consciousness while operating a motor vehicle, he is not negligent unless the loss of consciousness was foreseeable." 351 So.2d 204. Moreover, the Fourth Circuit noted that in cases "Where it has been demonstrated that drivers have had prior blackout experience from epileptic convulsion [footnote omitted], alcoholism [footnote omitted] or diabetes [footnote omitted], for example, the courts have found negligence based on foreseeability. 351 So.2d 204, 204-205.
In Martino, supra there was testimony from the decreased defendant's treating physician that the defendant "could not reasonably foresee he would black out *124 while driving because of his heart condition and that his loss of consciousness followed the onset of his attack almost simultaneously." 351 So.2d 204, 205.
In the instant case, Miller knew that she had a 20 minute lapse at age 10. She also admitted that there were times when her parents had to inform her that she had a seizure. She was on notice that she had seizures she could not recall. She acted negligently by failing to seek medical advice to determine whether she should be operating a vehicle under the circumstances.
Moreover, Miller's physician Dr. Weisberg testified that if she were having the type of seizure described by Dr. Derbes then the blackout on the date of the accident would be foreseeable; if on the other hand she was merely having "speech arrest seizures" then the blackout would not be foreseeable.
Since Miller sought no medical attention from a specialist from 1977 or 1978 to 1983, there is no medical evidence of the type of seizures she had during this period. The only evidence available to the jury was Miller's testimony that she had "speech arrest seizures". Her husband even admitted that he did not observe all of the seizures she had. Miller, however, noted that her typical seizure was that noted in the hospital chart. That seizure, however, resulted in a loss of consciousness and inability to respond to her environment.
Obviously Miller was not in a good position to describe her seizures since if she lost consciousness she would be unable to recall that she had done so.
We conclude that Miller has not borne her burden of showing that her loss of consciousness was unforeseeable. We conclude that the jury's determination that Miller was free from negligence is clearly wrong. We therefore reverse the trial court's judgment and decree that judgment be granted in favor of Dr. Katherine Knight and against State Farm Mutual Insurance Company.
Since the jury found no negligence on the part of Miller it did not address the issue of whether Knight had been adequately compensated for her injuries when she received the $22,000.00 settlement. However, when an appellate court has all of the facts before it a remand is unnecessary. Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975), Schouest v. Stipelcovich, 490 So.2d 294 (La.App. 5th Cir.1986).
Dr. Thomas S. Whitecloud, III, an orthopedic surgeon, testified that he first saw Knight as a patient on November 4, 1983, the day following the accident. He found that she had a pre-existing degenerative disc at C5-6 as well as in the low back. Knight suffered a soft tissue injury of the supporting structures of the neck, in particular acute cervical sprain.
On her next visit on December 2, 1983 she suffered increased pain because of pressure on the nerves which come out of the neck. On December 5th, 6th, 8th, 15th, 20th, and 22nd she went for physical therapy at Tulane Medical Center and showed gradual improvement. She did however have continued spasm in the back-neck region and shoulder. He further testified that in order to make a definite diagnosis as to the cause she would need a CAT-scan, a type of x-ray, or a cervical myelogram. He also testified that at the time he saw Knight he did not feel that tests were indicated because he "didn't think that she had anything serious enough to require surgery." He did not see her after June 1, 1984. Additionally, she only mentioned low back pain to him on her first visit to him.
On her last visit of June 1, 1984 she reported greater difficulty. She was having more problems with the right upper extremity and he ordered an EMG test to see if there was any nerve irritation or nerve damage coming from the neck.
Dr. Michael A. Wilensky, a neurologist, testified that he had performed the EMG test in June 1984. He saw Knight on August 9, 1984 and took a history from her. She informed him that she had been in two accidents, one on November 3, 1983 and a second one on August 5, 1984. He found that she had initially had a neck problem which, apparently had resolved according to the history that the plaintiff gave Dr. *125 Wilensky. It was no longer a problem until the second accident. He testified that she related the following information: "after physical therapy, her neck had pretty much resolved to occasional discomfort and occasional paresthesia in the right hand. She now related that she had beg[un] to have jolting sensation since this past Sunday, after the second accident. It was down the right arm with severe neck pain. She had increased difficulty with sleeping at night and complained of aggravation of the pins and needles, which had previously resolved after several months. The patient had some mild low back pain which had been noted previously, but, was not really aware of until the second accident. She relates that she had difficulty sleeping on the right side because of pain down the right leg in what was described as the sciatic nerve."
Appellant, however, stresses that on the date of the second accident, Knight was wearing a neck collar, which suggests that she was having problems with her neck and that it had not in fact been resolved. However, Knight testified that on the date of the second accident she was wearing a neck collar as a "precaution" since it was raining on that date and rain always aggravated her pain. She also testified that her neck was sore and hurting on that date. Nonetheless, in the history taken by Dr. Wilensky four days after this second accident, she informed him that her pain had pretty much resolved from the first accident. Additionally, the EMG performed by Dr. Wilensky was found by him to be within normal limits.
If a plaintiff receives an injury through the negligent act of another and the injury is subsequently aggravated by another accident, then that would-be tortfeasor is only liable for the original injury and not the subsequent one. Moreover, the plaintiff has the burden of proving that the subsequent injuries were not the result of a separate, independent and intervening act for which the defendant was in no way responsible. Waggoner v. Marquette Casualty Corp., 181 So.2d 475 (La.App. 2nd Cir.1965); Livacarri v. United Jewish Appeal, Inc., 126 So.2d 67 (La.App. 4th Cir. 1961).
We conclude that Knight has failed to carry her burden of proof that the accident of November 3, 1983 caused her to have a serious nerve root problem. Moreover, the record indicates that most of the cervical sprain problems attributable to the November 3, 1983 accident had resolved by the date of the second accident on August 5, 1984.
We find that the $22,000.00 already received by Knight is adequate compensation for her injuries. Accordingly, we decree that Knight has been adequately compensated.
For the reasons stated the judgment is reversed and judgment is now entered in favor of Knight and against State Farm Mutual Insurance Company. Furthermore, for the reasons stated, we decree that Knight has been adequately compensated by the $22,000.00 settlement from Government Employees Insurance Company.
REVERSED AND RENDERED.