DOMENGEAUX, Judge.
Mark G. Zimmerman and Patricia A. Zimmerman commenced these proceedings to recover damages for the injuries they sustained as a result of an automobile accident involving Patricia Zimmerman. Patricia Zimmerman sought compensation for a cervical strain and shoulder injuries, including impingement syndrome and torn rotator cuffs. Mark Zimmerman sought recovery for loss of consortium.
The Zimmermans named as defendants: (1)Phillip D. Collins, the driver of the vehicle which struck the Zimmerman automobile; (2) Blaney’s Oilfield Speciality, Inc. (Blaney’s), the owner of the vehicle driven by Collins; and (3) Bituminous Fire & Marine Insurance Company (Bituminous), the automobile liability insurer of Blaney’s. The defendants admitted liability, but contested the extent of the Zimmermans’ injuries and quantum. The Trial Court rendered judgment in favor of Patricia Zimmerman, awarding her $15,340.66 for her cervical injury, of which $12,500.00 was for pain and suffering. The claim of Mark Zimmerman for loss of consortium was dismissed.
The plaintiffs sought this review and have assigned five errors. They maintain:
(1) The Trial Court erred in concluding that Patricia Zimmerman failed to prove that her acromioclavicular joint and rotator cuff injuries were caused or aggravated by the November 1, 1984 accident;
(2) The Trial Court erred in only giving “little, if any, weight” to the testimony of Dr. Jesse L. Henderson and Dr. David A. Ball;
(3) The Trial Court erred in concluding that Patricia Zimmerman failed to prove that all of the medical expenses introduced into evidence were reasonably required and reasonably responsive to the injuries suffered in the November 1, 1984, accident;
(4) The Trial Court erred in failing to award Patricia Zimmerman medical expenses and compensation for damages incurred subsequent to December 18, 1984 for the cervical strain she suffered on November 1, 1984; and
(5) The Trial Court erred in failing to award Mark Zimmerman damages for loss of consortium.
Subsequent to a thorough review of the law and the record, we believe the decision of the Trial Court should be affirmed. We find the conclusions and reasoning of the *531 Trial Judge to be sound and, therefore, may not reverse on the grounds that he committed manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Virgil v. American Guarantee and Liability Insurance Company, 507 So.2d 825 (La.1987) (Manifest error standard is equally applicable to written reports, records and depositions.). The “Reasons For Judgment” of the Trial Judge, Honorable W.C. Falkenheiner, are thorough and well-presented and are, therefore, being adopted by this Court as its opinion.
FACTS
“On November 1st, 1984, plaintiff was driving her automobile in a westerly direction on U.S. 84 in downtown Vidalia. She had come to a complete stop when she was struck from the rear by a vehicle belonging to the defendant, Blaney. The Bla-ney truck struck the right rear of plaintiffs vehicle causing damage in the amount of $928.00. Plaintiff testified that she was knocked forward and then backward and put on [her] brakes to stop her car. Her car remained fully operable after the accident and she continued to drive it for some time before trading it in on another vehicle.
“Immediately after the accident plaintiff drove herself, in her vehicle, to the office of her personal physician, Doctor Hicks, in Natchez where she was examined. Plaintiff continued to visit Doctor Hicks approximately five times during which he prescribed pain medication and had her x-rayed. The x-rays were essentialy negative. Plaintiff never complained to him of any injury to her shoulders. Plaintiff also went to a Doctor Ashcroft, a chiropractor, but also made no complaint about shoulder injuries to him, but confined her complaints to the area of her neck. Neither Doctor Hicks or Doctor Ashcroft testified at trial or by way of deposition.
“On November 28th, 1984 plaintiff made her first visit to Dr. Jesse Henderson, an orthopedist, who examined her. He also did not testify, but his deposition was admitted in lieu thereof. He admitted her to the hospital on December 11, 1984 after three office visits. Plaintiff remained in the hospital for eight days where she was given a number of tests and treatment under the direction of Doctor Henderson, but no surgery. On December 12th, 1984 she made her first complaint of injury to her shoulder. Doctor Henderson’s diagnosis of plaintiffs injury at her discharge on December 18th, 1984 was that she suffered an acute cervical syndrome. This diagnosis is found in all of the medical records of that period. (Exhibit P-2.) The roengeno-logical consultation from Humana Hospital, dated December 12th, 1984, shows the following:
C-SPINE SERIES WITH FLEXION AND EXTENSION VIEWS 12-12-84: Vertebral bodies Cl through C7 are readily visualized. The flexion and ex-tention views reveal no fractures or sub-luxations. The odontoid process presents a satisfactory appearance. No spurring changes of a significant nature are present. No lytic or blastic lesions are demonstrated.
IMPRESSION: UNREMARKABLE C-SPINE SERIES.
BOTH SHOULDER SERIES 12-12-84: No fractures or dislocations are demonstrated. The acromioclavicular joints are symmetric and no abnormal soft tissue calcifications are identified. IMPRESSION: UNREMARKABLE SHOULDER SERIES. BILATERALLY
“After discharge, plaintiff continued to have difficulty and consulted with Doctor Henderson who again hospitalized her on February 4th, 1985. On February 12th, he performed surgery on her left shoulder which consisted of an acriomectomy and Mumford procedure for the impingement problem and a repair of a torn rotator cuff. Doctor Henderson testified that this surgery was successful and that plaintiff recovered “nicely”. After discharge, on March 19th, 1985, Doctor Henderson, in the discharge summary, stated:
DIAGNOSTIC IMPRESSION: acute cervical syndrome with radiation.
SECONDARY DIAGNOSIS: possible impingement syndrome and AC arthritis of left shoulder. (Exhibit P-2).
*532 “Plaintiff continued to experience difficulty and Doctor Henderson again hospitalized her on June 4th, 1985 and performed the same surgical procedure on her right shoulder. Doctor Henderson also testified that this procedure was also successful and that plaintiff recovered.
“After the second surgery, plaintiff continued to complain and in March of 1986, Doctor Henderson referred her to Doctor Ball, another orthopedist who had consulted with him briefly with respect to plaintiffs problems prior to both of these surgeries. Doctor Ball had previously agreed with Doctor Henderson that these surgeries were required.
“On March 19th, 1986, Doctor Ball hospitalized plaintiff for eight days for a diagnosis and treatment and she was discharged without improvement. Doctor Ball testified at the trial. He stated that plaintiff’s difficulties were consistent with the type of accident described by her and said that she was 5% totally disabled.
“The testimony in the case also revealed that plaintiff had been involved in four similar accidents. On May 5th, 1983, she was a passenger in a car that had been rear-ended which caused injury to her neck and for which she was treated by Doctor Henderson who stated she had no shoulder pains and made a complete recovery. In September of 1984, plaintiff was in an accident on the Mississippi River bridge at Vidalia when she, as the driver of an automobile, rear-ended another car that was stopped on the bridge.
“On November 1st, 1984, she suffered the accident which is the subject of this litigation. On November 26, 1986, at approximately 2:30 A.M., plaintiff was involved in a collision at the parking lot of a nightclub in Natchez when she was in an automobile with her husband. After this accident plaintiff sought pain medication from Doctor Henderson and later visited him. As stated, in March of 1986, she became Doctor Ball’s patient. Doctor Henderson was not questioned about the second accident because defense counsel was not aware of it at the time the deposition was taken. Counsel for plaintiff also did not bring up that matter.
“Plaintiffs originally sought damages for the injuries to Patricia Zimmerman’s shoulders, neck and head, damages for mental pain and suffering, both past and future, and for lost wage earning capacity. They sought damages for Mark Zimmerman for loss of consortium. In brief to this Court, the plaintiffs now characterize their request as follows:
Shoulder injury $160,000.00
Neck injury 50,000.00
Accrued medical 28,630.39
Future medical 4,087.50
Loss of consortium 25,000.00
$267,717.89
“Apparently the claim for lost wages is abandoned. The record in this case would not, in my opinion, authorize a judgment for that item. The only evidence in the record with respect to employment by plaintiff was a brief employment at the Pizza Hut which terminated about a year before the accident when plaintiff was employed at minimum wage and quit because she did not like the hours. She worked for a Doctor Hall for two months immediately after the accident. She did light work for Doctor Hall, who was a veterinarian but quit because she wanted to stay home and watch television. Doctor Henderson did not place any restrictions on her. In fact, none of plaintiff’s doctors placed any restrictions on her activities, except for those that were of any limited duration because of her surgery and the restrictions that Doctor Ball placed on her after the accident of January 26th, 1986 when plaintiff suffered a recurrence of her cervical problem. Accordingly I have not considered any claim for lost wages.
“Plaintiff testified that she had been physically active by bowling, fishing, hunting, and playing softball. On cross-examination, she admitted that she had continued with her housework after the accident and had quit bowling in 1983 when her baby was born. She continued to swim, but does not play softball, although Doctor Henderson was of the opinion she could throw a ball. She did go hunting with her *533 husband, but he complained of her changed personality and attitude.
OPINION
“There are two general problems with respect to deciding the award to be given plaintiff in this case. That is, whether or not all of the injuries complained of, and the resulting medical treatment given to plaintiff, were caused by the accident of November 1st, 1984. Plaintiff claims that she has proved that they were, and defendant strenuously contends that plaintiff has not sustained the burden of proving that these injuries, particularly the damages to the rotator cuffs, were caused by the accident at issue here.
“The second general problem relates to an assessment of a monetary value to those injuries which are found to have been caused by this accident and the cost of medical treatment reasonably necessary.

The causation problem.

“Plaintiff has proved that she has three physical problems. That is, an injury to the cervical or neck area, the impingement syndrome and the torn rotator cuffs. Defendants have admitted the existence of the neck or cervical injury and only question the extent of it. Defendants do question the causation of the two shoulder injuries and their extent.
“The proof offered by plaintiff in support of her claims consisted of:
“(a) Her testimony at trial.
“(b) The testimony of Drs. Henderson and Ball as to the nature and extent of her physical problems at the time they treated her after the accident and their opinion that her problems and complaints were consistent with her description of the accident. Doctor Henderson was specifically of the opinion that her problems were the result of the accident.
“(c) The testimony of plaintiffs father and husband as to the effect of the accident upon her behavior.
“Evidence and factors tending to weaken the plaintiffs proof and claim are:
“(a) The minor nature of the accident which is apparent from the small amount of damage to her car, the fact that she continued to operate it until it was traded without repairs; no evidence of any damage to the Blaney vehicle, no evidence as to the speed of the Blaney vehicle or the force of the collision other than the damage to plaintiffs vehicle itself. Plaintiff simply stated that she was thrown forward and then back and her car was stopped by applying her brakes. Plaintiffs two small children were in her car, but were not injured or thrown about.
“(b) Plaintiff presented no testimony of Doctor Hicks who saw her on the day of the accident and treated her prior to her seeing Doctor Henderson. She also did not present testimony of Doctor Ashcroft, who also treated her.[1] Plaintiff also testified that Doctor Hicks had her x-rayed and simply gave her some pills, all of which indicate that in his opinion her injuries were of a relatively minor nature.
“(c) The plaintiff herself testified that she continued somewhat normal activities after the accident. As pointed out before, she worked for two months for a veterinarian, Doctor Hall, and quit that job only because she wanted to watch her stories on television.
“(d) There is no evidence that plaintiff made any complaints of shoulder pain until December 12th of 1984. All of the hospital records and Doctor Henderson’s initial records indicate complaints relative to neck or cervical injuries. The complaint of December 12th, 1984 was found in a nurse’s entry.
“(e) The diagnosis of Doctor Henderson, after plaintiff had an extensive period of hospitalization with tests and treatment, dated December 18th, 1984 that plaintiff suffered acute cervical syndrome. No mention is made of the shoulder and rota-tor cuff problems discovered later.
*534 “(f) The plaintiff refused to allow the defendants to conduct an independent medical examination of plaintiff as early as January 15th, 1985. This is of particular significance in this case because it is at this time that Doctor Henderson first gave any attention to the area at the end of her shoulders where they are joined by the arms. (See Exhibit P-1 and page 11 of Exhibit P-3). Prior to this, as noted above, all emphasis had been on the cervical area, which includes the shoulder at the base of the neck and as a shaded (sic) in the diagram in Exhibit P-2 made at the time of her discharge on 12-18-84. Specifically it was on 12-27-84 that Doctor Henderson made his first injection for pain on those portions of her shoulder which eventually required the surgery, and described by Doctor Henderson as the AC problem. Plaintiff had been an active person, playing softball and bowling, both of which require considerable use of the arms. Doctor Henderson described the AC problem as one which is common to people of this type. Nevertheless, he attributes plaintiffs problems to ‘the injury’, although he did not find the AC problem earlier even after the eight days of tests and hospitalization.
“Since the problem addressed by Doctor Henderson on 12-27-84 is a common one, and can be caused by factors other than the type of accident in which plaintiff was involved, his deferred opinion that the new problem was also caused by the automobile accident should be clearly verified. A second medical opinion might have been able to do this but plaintiff refused to allow it, and persisted in this refusal until after the suit was filed on October 2nd, 1985. This was, of course, almost one year after the accident and after two episodes of hospitalization and surgery on plaintiffs shoulders. My understanding of the effect of this refusal is that the Court is to apply the rules set out in the case of Boudreaux v. Travelers Insurance Company, 212 So.2d 534 (La.App. 1st Cir.1968) wherein the Court held under similar circumstances that:
‘We, therefore hold that the testimony of the doctors is admissible but the failure to allow the plaintiff to submit to a medical examination does affect the weight to be given the plaintiffs medical evidence as to her physical condition prior to her submission to an examination by defendant.’
“I therefore conclude that little, if any, weight should be given to Doctor Henderson’s opinion that the AC and rota-tor cuff problems were caused or aggravated by the November 1st, 1984 accident.[2]
“(g) Doctor Passman’s [the defendant’s medical expert] unrebutted testimony that had plaintiff suffered the impingement syndrome and torn rotator cuff injury in the accident that she would have suffered immediate pain at the point of her shoulders, and this would have been especially true in any type of activity such as that in which she engaged, by her own admission, after the accident.
“(h) In brief to this Court, plaintiff has argued that the large number of visits to the doctors and her three hospitalizations, all occurring after the accident, are themselves proof of the extent of injuries suffered by her in the accident. This appears to me to be a boot strap type of argument entitled to little weight. This would be so, first, because plaintiff has offered no specific proof that these many visits to the doctors were necessitated by her accident injuries, but seems to be of the opinion that the Court should assume this to be a fact simply because they occurred after the accident. Secondly, plaintiff’s own evidence shows that she had a substantial history of other medical problems totally unrelated to the accident, some of which required hospitalization. These medical problems including kidney infections, frequent headaches of undetermined origin, nausea and nervous stomach and other matters. (See Exhibit P-2). Thirdly, none of the plaintiff’s doctors ever stated that all of her visits were specifically ordered by them, and that *535 they were a required part of her treatment. Once again, the Court is left to assume that all of this medical was reasonbly required and reasonably responsive to the injuries suffered in the accident.
“(i) On August 1st, 1985, after both operations, Doctor Henderson was of the opinion that plaintiff had good range of motion in both shoulders, and had no difficulty except for some slight discomfort when there is a change in the weather. Plaintiff could do anything she wanted to do, including bowling and throwing a ball: He did, however, have reservations about her cervical problem and stated that they would worsen with age.
“There are also indications in the record that plaintiff did continue to suffer cervical pain along with the problems which developed at the ends of her shoulders, which eventually caused the surgery although there is no objective evidence of the cervical injury.
“It is therefore difficult to determine from this record exactly what, if any, of the medical expenses subsequent to Doctor Henderson’s original diagnosis at the termination of plaintiff’s first hospital stay are attributable to the cervical problems and what are attributable to other problems, including both the surgery and plaintiff’s prior existing ailments which had no connection with the accident.
“Doctor Ball’s testimony is not particularly helpful in resolving this problem. On direct examination, he testified that plaintiff had a cervical disc injury which will worsen with time. He could find no objective evidence of this, stating that it was more than a muscle or ligament injury, but was not a rupture or herniated cervical disc. He first saw plaintiff only as a consultant prior to her two episodes of surgery, and his first treatment of plaintiff as a patient was in March of 1986. At that time, plaintiff did not tell him of her accident in January of 1986, and Doctor Ball stated that his opinion attributing her disc problems to the November 1984 accident would be affected had he been aware of the January 1986 accident. This would be especially so in view of Doctor Henderson’s August 1985 opinion that plaintiff had recovered from the November 1984 accident, both respective to her cervical problems and recuperation from the surgery.
“Plaintiff seeks to minimize the January 1986 accident, describing it as a ‘bump’ which did not injure her. This accident was sufficient to break the headlight and damage the grill on her automobile to the extent of $524.00 repair costs. Accordingly, the record with respect to the accident of November 1984 and that of January 1986 does not indicate objective differences of any substantial nature.
“Plaintiff did not seek immediate attention in January 1986, but did get a prescription from Doctor Henderson for pain three days after it, and made a visit to him later. She then went to Doctor Ball with apparent renewal of the cervical pain. Prior to January 1986, plaintiff was apparently only suffering pain when there was a weather change, and then it was located in her shoulders. She had also been off prescription drugs for some time. All of this would tend to indicate, as testified to by Doctor Passman, and as inferred by Doctor Ball, that any cervical problems which plaintiff had, and may have now, are a result of the January 1986 accident.
“It is therefore my opinion that the plaintiff has proved in this case that the injury described by Doctor Henderson in his diagnosis of December 18th, 1984 as acute cervical syndrome was caused by the accident of November 1, 1984, for which these defendants are responsible. I do not believe that plaintiff has proved, on the record, that her other problems, particularly those at the points of her shoulders, were caused by the accident. Plaintiff’s evidence of this is simply not sufficient to sustain the burden of proof required, particularly in view of all the negative factors stated. Quantum.
“Judgment will be rendered granting plaintiff the following:
(1) Medical Expenses 11/01/84 Jeff Davis Hospital Emergency Room $ 61.00
11/05/84 Jeff Davis Hospital Emergency Room 63.00
11/01 to 11/17/84 Dr. Herbert Hicks 110.00
*536 11/28 to 12/18/84 Dr. Jesse Henderson $360.00
12/11 to 12/18/84 Humana Hospital, Natchez 2,095.50
11/01/84 Radiology Association of Natchez 19.00
12/12/84 Radiology Association of Natchez 43.00
12/05/84 Gulf Medical Supply 79.50
11/05 through 12/18/84 Drug Bill 9.66
Injury because of acute cervical syndrome radiating into the top of the shoulders, including pain and suffering.[3] 12,500.00
TOTAL $15,340.66
THE CLAIM OF MARK ZIMMERMAN FOR LOSS OF CONSORTIUM
“The claim of Mark Zimmerman for loss of consortium is denied. It is my opinion that this record does not contain the type of information which would justify a special award for this type of damage. As noted in Lonthier v. Northwest Insurance Company, 497 So.2d 774 (La.App. 3rd Cir.1986), and Finley v. Bass, 478 So.2d 608 (La.App. 2nd Cir.1985), every personal injury tends to decrease the parties’ overall happiness. I can’t find that this record supports this claim in view of the finding that defendants are liable only for the cervical sprain suffered in the November 1, 1984 accident.”
For the above and foregoing reasons the judgment of the District Court is affirmed.
All costs of this appeal are assessed against: Mark G. Zimmerman and Patricia A. Zimmerman.
AFFIRMED.

. By the Court of Appeal. See also, Arnold v. Patterson, 224 So.2d 820 (La.App. 4th Cir.1969), writ denied, 254 La. 845, 227 So.2d 591 (1969); Kennedy v. New Orleans Ry. & Light Co., 142 La. 879, 77 So. 777 (1918).

. By the Court of Appeal. This reasoning is equally applicable to the testimony of Doctor Ball. See, Succession of Lyons, 452 So.2d 1161 (La.1984); Chatelain v. United States Fidelity & Guaranty Company, 495 So.2d 379 (La.App. 3rd Cir.1986), writ denied, 498 So.2d 756 (La.1986); Veazie v. Consolidated Companies, 350 So.2d 1302 (La.App. 3rd Cir.1977).

. By the Court of Appeal. See, La.Civ.Code art. 1999 (1984); Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Knight v. Miller, 503 So.2d 120 (La.App. 5th Cir.1987); Signorelli v. Jones, 483 So.2d 672 (La.App. 5th Cir.1986).