735 P.2d 772

**LA PAZ COUNTY, a political subdivision of the State of Arizona, Plaintiff,**

v.

**YUMA COUNTY, a political subdivision of the State of Arizona, Defendant.**

**No. 16466.**

Supreme Court of Arizona.

March 27, 1987.

Don Bennett Moon, La Paz Co. Atty. and Steven P. Suskin, Chief Deputy La Paz Co. Atty., Parker, and Sacks, Tierney & Kasen by Michael D. Hawkins, Scot C. Stirling, Phoenix, for plaintiff.

David S. Ellsworth, Yuma Co. Atty., and O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears by Jeffrey B. Smith, Phoenix, for defendant.

HOLOHAN, Justice.

This case involves a dispute over the division of assets between two counties necessitated by the formation of a new county (La Paz) from the existing territory of an existing county (Yuma). We have original and exclusive jurisdiction over disputes between counties. Ariz. Const. art. VI § 5(2).

## FACTS

On March 29, 1982, supporters of an effort to create a new county out of the northern portion of Yuma County filed petitions with sufficient valid signatures to mandate a special election under A.R.S. §§ 11–131 and –132.[1] The voters of Yuma County approved the measure on May 25, 1982 to create what is now La Paz County. In November 1982 voters in the new county elected county officials, and selected a

---

1. Shortly after the commencement of this litigation, the Legislature imposed a moratorium on the formation of new counties pursuant to title 11, Ch. 1, art. 3, A.R.S., effective May 15, 1983. Laws 1983, Ch. 291, § 13. Later, the Legislature, having found that "the existing law for the local formation of counties is substantially and procedurally inadequate to serve the public interest," Laws 1986, Ch. 115, § 1, repealed article 3, consisting of §§ 11–131 to 11–154, effective August 13, 1986. Laws 1986, Ch. 115, § 2. Further references in this opinion to A.R.S. §§ 11–131 to 11–154, therefore, will be to those statutes added by Laws 1974, Ch. 162, § 1, effective August 9, 1974. We express no views on the newly added statutory sections, A.R.S. §§ 11–131 to 11–145, added by Laws 1986, Ch. 115, § 3, effective August 13, 1986.

county seat and a name for the new county. La Paz County was duly organized as of January 1, 1983. La Paz filed its original complaint on February 17, 1983.

Pursuant to Rule 53(a) of the Arizona Rules of Civil Procedure, 16 A.R.S., this court appointed a special master to hear this case.[2] The special master filed his report with the court on January 22, 1986. The parties filed their objections with the court and appeared at a hearing on April 10, 1986.

## SCOPE OF REVIEW

Rule 53(h), Ariz.R.Civ.P., 16 A.R.S., provides for judicial use of special masters' reports and states that "[t]he court shall accept the master's findings of fact unless clearly erroneous." The rule provides that the "court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions." *Id.* The Arizona Rules of Civil Procedure were adopted from the federal rules; Federal Rule of Civil Procedure 53(e)(2) is nearly identical to Arizona's Rule 53(h). We give great weight to interpretations given to similar federal rules. *Jenney v. Arizona Express, Inc.,* 89 Ariz. 343, 349, 362 P.2d 664, 668 (1961).

The special master had the opportunity to observe the demeanor of witnesses, and to weigh the witnesses' credibility. *See NLRB v. Sequoia District Council of Carpenters,* 568 F.2d 628, 632 (9th Cir.1977); *Carter Oil Co. v. McQuigg,* 112 F.2d 275, 279 (7th Cir.1940). We believe the master's findings of fact are supported by the evidence and are not clearly erroneous.

We note that a master's conclusions of law, on the other hand, "are entitled to no special deference ... and will be overturned whenever they are believed to be erroneous." *Oil, Chemical and Atomic Workers Int'l Union v. NLRB,* 547 F.2d 575, 580 (D.C.Cir.1976), *cert. denied, Angle v. NLRB,* 431 U.S. 966, 97 S.Ct. 2923, 53 L.Ed.2d 1062 (1977) (footnote omitted).

## ISSUES

The underlying issue here concerns the proportionate entitlements to assets for La Paz and Yuma Counties pursuant to A.R.S. § 11–148 (1977). The statute read in full:

### § 11–148. Basis for division of county property

The right to property and revenue of the new county and the counties from which its territory is taken, or of any counties whose boundaries are changed, shall be ascertained upon the basis of the valuation of the property therein at the time of the last assessment of county taxes previous to the receipt of the initiative petition provided for in § 11–132. Upon such basis, the new county shall be entitled its proportionate interest in all the county property and money on hand at the time of its organization, and in all revenues to be derived from taxes assessed previous to such organization, and shall be chargeable with and liable for its due proportion of all debts contracted prior to its organization, including current expenses up to the time of the organization remaining unpaid.

The special master's report examined four issues: 1) whether Yuma County had a duty to implement an accounting and division of county assets prior to January 1, 1983, thereby warranting imposition of damages, 2) whether the proper method for valuing the assets involved in the county division is "assessed valuation" or "full cash value," 3) whether Article IX, section 20 of the Arizona Constitution applies to the property division between the two counties, and 4) whether La Paz County is entitled to interest on any or all of the monies due from Yuma County.

## I. IS LA PAZ ENTITLED TO DAMAGES?

In its amended complaint, La Paz seeks actual and punitive damages, alleging that Yuma failed to implement a working accounting and division of county assets prior

---

**2.** The special master appointed by the court was John P. Morris, Professor of Law, College of Law, Arizona State University.

to the formation of La Paz on January 1, 1983. La Paz bases this duty to account prior to new county formation on the language in A.R.S. § 11–148 describing its entitlement to a proportionate share of money and property "at the time of its organization." The new county additionally alleges dilatory and obstructive tactics by Yuma County officials throughout the creation process. Yuma County moved to dismiss this claim. On January 4, 1985, the special master decided, pursuant to Rule 12(b) of the Arizona Rules of Civil Procedure, 16 A.R.S., to treat Yuma's motion as a motion for partial summary judgment.

■ We agree with the special master's conclusion that Yuma County had no legal duty to implement a division of assets prior to La Paz County's formation, and therefore La Paz is not entitled to damages. A.R.S. § 11–148 simply establishes the basis upon which the division of county property is to be determined. Each county's right to property and revenue is based on the valuation of county property "at the time of the last assessment of county taxes previous to the receipt of the initiative petition provided for in § 11–132." A.R.S. § 11–148. This valuation is based on an already-completed process requiring no further action on Yuma County's part.

While A.R.S. § 11–148 does entitle La Paz to its proportionate share of county property and money on hand as of the date of its organization, it does not establish any duty on Yuma's part to make an accounting or division prior to that time. Nor does any other statute in article 3, which relates to creation of new counties, impose an affirmative duty on the existing county to prepare such an accounting or division. It is well settled that a board of supervisors possesses only those powers expressly conferred by statute or necessarily implied therefrom. *Peters v. Frye*, 71 Ariz. 30, 34, 223 P.2d 176, 178 (1950). We will not judicially impose duties on county officials that were not contemplated by the Legislature.

■ Nor does the election commission have any duty to divide county assets or prepare an accounting. Once the voters approve the county split proposition, an election commission is established for the purpose of organizing the new county. A.R.S. § 11–141 (1977). The election commission is granted powers and duties similar to those of a board of supervisors with respect to the new county, until the officers of the new county are elected. A.R.S. § 11–142 (1977). The key portion of this statute, however, reads: "[t]he proposed new county shall not be deemed to exist for any purpose other than for completion of its organization until the officers thereof are elected and qualified." *Id.* In addition, A.R.S. § 11–143 (1977) mandates that the commissioners divide the proposed new county into precincts and voting districts and prepare for the election of officers at the next general election. We believe this statute limits the commissioners' powers and duties to those related to preparing the county for the general election at which a board of supervisors for the new county will be selected. *See* Ariz.Atty.Gen.Op. No. I82–023. Since the new county shall not be deemed to exist except for organizational purposes until the officers are elected, the election commissioners have no duty beyond preparing for the next election.

■ A.R.S. § 11–149 (1977), however, *does give the board of supervisors of the new* county the authority to "settle and adjust all questions arising from the organization of the new county ..., and involving respective rights and obligations." We believe, therefore, that the Legislature intended that only the board of supervisors of the newly established county would have the power to settle the accounts involved in the division of assets contemplated by A.R.S. § 11–148.

■ We conclude that Yuma has conformed to the requirements of A.R.S. §§ 11–131 through –154 insofar as it did appoint an election commission to organize the new county and expeditiously conducted the election which resulted in the formation of La Paz County. We note the special master's finding that the election commissioners did meet with the Yuma County Board of Supervisors to "speed up the division of assets." Nevertheless, we agree

that the election commissioners did not have authority under our statutes to bind the new county to an estimate of its "proportionate interest" in county assets. Yuma County was not responsible for conducting an accounting and division of assets before January 1, 1983. We therefore follow the recommendation of the special master and grant Yuma's motion to dismiss the claim of La Paz for damages.

## II. METHOD OF VALUATION

██ Yuma argues that "valuation" as used in A.R.S. § 11–148 means "full cash value." Yuma contends that since "valuation" is not defined in Title 11, the definition of "valuation" as "full cash value"[3] in A.R.S. § 42–201(13) should be used. La Paz contends that the statute refers to "assessed valuation."[4] Yuma's proportionate entitlement to property and money on hand at the time of La Paz County's organization would be 83.3% under a "full cash value" determination, but only 81.6% under an "assessed valuation" determination. La Paz, on the other hand, would be entitled to 18.4% if "assessed valuation" is used, but only 16.7% if "full cash value" is used.

The special master concluded that "assessed valuation" is the correct interpretation. We agree with this conclusion. The special master noted that the three sections of A.R.S. § 11–131 prohibit the creation of counties which fall below certain percentages of assessed valuation. These threshold amounts of assessed valuation have been established in order to enable the new and old counties to survive as viable entities. Reasoning from this, the special master concluded that "assessed valuation" should be the controlling standard for § 11–148 as well. While this reasoning may provide some basis for understanding the meaning of "valuation" in A.R.S. § 11–148, we believe there is a more direct

approach derived from the language of § 11–148 itself.

The context of the word "valuation" in A.R.S. § 11–148 is crucial. The statute sets the date for the valuation "at the time of the last assessment of county taxes previous to the receipt" of the new county election petition. The petition was received on March 29, 1982. A.R.S. § 42–304 establishes the annual date for levy and assessment of the tax levy as the third Monday of August. The last assessment of county taxes prior to March 29, 1982 took place on August 17, 1981. This is a final assessment of taxes, which is based on the assessed valuation of all taxable properties. We believe, therefore, that § 11–148 contemplates the use of "assessed valuation." We uphold the special master's finding that based on the use of "assessed valuation," Yuma County is entitled to distribution of 81.6% of the county assets, revenues and debts, and La Paz County is entitled to 18.4%. Using the foregoing percentages, we accept the special master's recommendation and order Yuma County to pay to La Paz County the sum of $2,023,685.

## III. CONSTITUTIONAL EXPENDITURE LIMITATION

Article IX, § 20 of the Arizona Constitution prohibits expenditures by political subdivisions in excess of certain limits, and contains several provisions which allow expenditures over the limits in certain situations. "Expenditure" is defined as "any authorization for the payment of local revenues." Ariz. Const. Art. IX, § 20(3)(c). La Paz County argues that this action concerns the division of county assets, not the payment from revenues or expenditures. La Paz reasons that the judgment and any associated costs or fees from this action, therefore, do not fall within the purview of Article IX, § 20, which concerns limits on spending. La Paz argues that it is entitled

---

**3.** "Full cash value" is defined in § 42–201(4) as "synonymous with market value." The definition states that "[f]ull cash value shall be used as the basis for the purpose of assessing, fixing, determining and levying secondary property taxes." *Id.*

**4.** "Assessed valuation" is defined as "the value derived by applying the applicable percentage [provided for in another statute, which percentage varies according to the statutory classification of the property] to the full cash value or limited property value, whichever is applicable, of the property." A.R.S. § 42–201(1).

to the judgment as its proportionate share in the division of county assets.

Yuma, on the other hand, believes that the judgment and any costs associated with this action *do* fall within the spending limits set up by Article IX, § 20 of the Constitution. As a result, Yuma could pay La Paz the judgment over an extended period of time in order to keep within the mandated spending limits.

■ The special master's report indicated that two subparagraphs of Article IX, § 20 might apply to this situation. Subparagraph (4) of Article IX, § 20 provides that the Economic Estimates Commission may adjust the base limit (local revenue payments for fiscal year 1979–80) "to reflect subsequent transfers of all or any part of the cost of providing a governmental function." We do not believe that this paragraph is applicable to this case. There has been no transfer of the costs of providing a governmental function; this case involves a division of assets between two counties.

■ Subparagraph (5) of Article IX, § 20 also does not apply to this situation. It simply allows the Economic Estimates Commission to adjust the base limit "to reflect any subsequent creation ... of a new political subdivision." In other words, the commission may establish the spending limits for the new counties. This subsection is *not* an exception to the basic rule in subparagraph (1) that political subdivisions may not spend over a certain limit.

■ The special master also cites several statutory sections which implement the constitutional spending limits (A.R.S. §§ 41–562 et seq.). However, none of these statutes address the issue whether the supreme court's judgment on the division of county assets falls within the constitution's spending limitations. A.R.S. § 41–563(A)(7) does deal with county division, but only insofar as determining the expenditure limitations for each of the new counties. The special master also cites A.R.S. §§ 42–302 et seq. A.R.S. § 42–302 provides that the governing board of each political subdivision shall prepare a financial statement and an estimate of anticipated expenditures. It does not address whether payment of a judgment on the division of county assets is an expenditure within the meaning of Article IX, § 20 of the Constitution.

■ It is clear that the purpose of Article IX, § 20 of the Arizona Constitution was to limit expenditures of political subdivisions to fiscal year 1979–80 levels modified by annual adjustments to reflect changes in population and the cost of living. This case, however, involves the division of property and revenue formerly held by Yuma County prior to its division. The case is simply a division of assets between two political subdivisions that formerly were one entity. Thus, the judgment rendered in this case does not represent an "expenditure" of Yuma County's revenue, rather it represents a determination of the share of assets held by Yuma County which belong to La Paz County and which Yuma County is under an obligation to turn over to the new county. Such a division of assets does not constitute an expenditure within the meaning and intent of Article IX, § 20.

Although the division of assets is not subject to the limitations mandated by Article IX, § 20, the expenditure of funds for costs, fees, and interest are another matter. Certainly, these items arise out of and are a part of the efforts to effect a division of the assets, but they are also separate items incurred after the division of the counties. They are not part of the assets to be divided. They represent the expense incurred in obtaining the division, and we believe they fall within the meaning of "expenditures" as used in Article IX.

We hold that Art. IX, § 20 of the Arizona Constitution and its implementing statutes do not apply to the judgment but do apply to costs, fees and interest.

## IV. INTEREST

La Paz claims a right to an award of interest on the amount due from Yuma. It bases the claim in part on (a) its being the prevailing party in the lawsuit, and (b) its entitlement to a split of county assets un-

der A.R.S. § 11–148 "at the time of its organization" and not years later.

On September 4, 1984, Yuma County filed an accounting with this court showing that it owed La Paz County $433,427.55. La Paz moved that this amount be distributed to it in December 1984. On June 14, 1985, the special master determined that La Paz was entitled to $433,427.55. No recommendation was filed with this court at that time requesting that such a distribution be ordered.

La Paz tried again to obtain these funds on September 5, 1985 just prior to this matter going to trial. Yuma County opposed the distribution of these funds even though it acknowledged that the September 4, 1984 Notice of Accounting was based on values for real property and improvements prepared for it by its own appraiser, Joe Wehrle. Nevertheless, Yuma apparently questioned Wehrle's appraisals and retained another appraiser to determine the market value of certain properties, namely, the Airport Fairgrounds, the Jose M. Redondo Complex, the Avenue "B" Complex, and Somerton Housing Complex and Adair Park. The new appraisals were significantly lower than those of the previous appraiser. The special master has recommended that this court order Yuma to distribute $433,427.55 to La Paz upon the filing of his report, and that interest should be paid on the remaining amount due La Paz to prevent further erosion of these funds.

Yuma argues that because the amounts due in this case involve disputed valuation they are not liquidated claims, and therefore La Paz is not entitled to any award of interest.

▪ Where money belonging to a party is not timely paid, interest is generally awarded. 47 C.J.S. *Interest & Usury*, § 16. This is because the party entitled to use of the money has been deprived of that use, and the party retaining it has been unjustly enriched. *Id.* The mere fact that the parties dispute a claim does not defeat the allowance of interest. *Simpson v. Norwesco, Inc.*, 583 F.2d 1007, 1013 (8th Cir.1978).

▪ Because this is a matter of original jurisdiction, the judgment this court renders is the first for the parties. Therefore, despite the passage of almost four years since La Paz County's organization, any interest we might award constitutes prejudgment interest.

A party's entitlement in Arizona to prejudgment interest depends on whether the amount awarded is liquidated or unliquidated. *See Arizona Title Insurance and Trust Co. v. O'Malley Lumber Co.*, 14 Ariz.App. 486, 496, 484 P.2d 639, 649 (1971). "A claim is liquidated if the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance upon opinion or discretion." *Id.*, *citing* C. McCormick, *Damages* § 54 (1935). We note that prejudgment interest on a liquidated claim is a matter of right. *Fleming v. Pima County*, 141 Ariz. 149, 155, 685 P.2d 1301, 1307 (1984). Conversely, prejudgment interest is generally not allowed on unliquidated claims. *Arizona Feeds v. Southern Pacific Transp. Co.*, 21 Ariz.App. 346, 355, 519 P.2d 199, 208 (1974).

▪ We find that the sum of $433,427.55 Yuma conceded was due La Paz is a liquidated amount. The values for the property were determined by Yuma's own appraiser, and were adopted by the special master. It is a fundamental rule of law that parties are bound by their judicial declarations. *Adams v. Bear*, 87 Ariz. 288, 294, 350 P.2d 751, 755 (1960). This is particularly so where the admission concerns facts central to the controversy at hand. *Cf. Sholly v. Annan*, 450 F.2d 74, 77 (9th Cir.1971). We find, under the circumstances of this case, that Yuma is bound by its September 4, 1984 statement that it owed La Paz County $433,427.55. Consequently, this sum was computed with exactness, and therefore prejudgment interest on this amount is appropriate.

We adopt the Report of the special master as modified in this opinion. Yuma is hereby ordered to distribute to La Paz a total of $2,023,685, with interest on the liquidated sum of $433,427.55, from September 4, 1984, and interest on the remain-

der of the judgment ($1,590,257.45) from the date of issuance of the mandate, the interest to be calculated at the lawful rate.

GORDON, C.J., and HAYS, J. (Retired), concur.

Justice JACK D.H. HAYS participated in the consideration of this case prior to his retirement, and he was called back to active service to participate in the final determination of the case.

Justice JAMES DUKE CAMERON recused himself and did not participate in the determination of this matter.

Justice JAMES MOELLER did not participate in the determination of this matter.

FELDMAN, Vice Chief Justice, dissenting.

I concur in parts I through III of the court's opinion and agree that La Paz County was entitled to $2,023,685 for its share of county assets. I dissent from part IV of the court's opinion because law, logic, and basic principles of fairness establish La Paz's right to prejudgment interest on the total award from January 1, 1983, "the time of its organization...." A.R.S. § 11–148.

### I.

The majority awards La Paz prejudgment interest on $433,427.55 because this amount was supposedly "liquidated," that is, known and relatively certain, before today's decision. At 168, 735 P.2d at 778. By implication, the majority concludes that the rest of the judgment was unliquidated because it was uncertain and was based on appraisal and opinion before today. *Id.*

The majority's distinction is untenable.[1] The $433,427.55 was not "liquidated" before today. It is merely an amount that Yuma once proposed as the amount due La Paz based on an appraisal which was later discarded and replaced by another appraisal. *See* Master's Report, Part IV. The entire amount owed La Paz, including the portion which the majority finds "liquidated," was equally unknown and unknowable until today. It could only be determined by applying the judicial valuation process to the facts in the record. The Master, in fact, did not distinguish between the two amounts and recommended prejudgment interest on the entire award from the date of his report. Master's Report, Part IV, at 20–21.

Despite the lack of any principled difference between the "liquidated" and "unliquidated" portions of La Paz's award, the court relies on the so-called distinction between liquidated and unliquidated damages to determine whether prejudgment interest is warranted. That distinction has been the subject of persuasive and wide-ranging criticism.[2] Even if we ignore the critics,

---

1. Arizona cases do little to clarify the distinction. *Compare Fleming v. Pima County*, 141 Ariz. 149, 685 P.2d 1301 (1984) (claim is liquidated where its amount may be computed from evidence in the record) *with Northern Arizona Gas Service, Inc. v. Petrolane Transport, Inc.*, 145 Ariz. 467, 702 P.2d 696 (App.1984) (uncertainty over profit margins is inconsistent with the concept of liquidated damages) and *Homes & Son Construction Co., Inc. v. Bolo Corp.*, 22 Ariz.App. 303, 526 P.2d 1258 (1974) (claim on cost plus construction contract held to be liquidated even though there was considerable dispute as to the amount of cost). The distinction has not fared any better in other jurisdictions. *See, e.g., Stevens-Scott Grain Co. v. Atchison, T. & S.F. Ry.*, 96 Kan. 1, 2, 149 P. 744, 744 (1915) ("the distinction is a mere verbal one"); *The Manhattan*, 85 F.2d 427, 429 (3d Cir.1936) (distinction is "little more than a difference in words"). For example, "courts have often shown an entire willingness to award interest on the value of property" even though that value "necessarily depends"

upon the "opinion of those who claim to know the market." D. DOBBS, HANDBOOK ON THE LAW OF REMEDIES § 3.5, at 165–66 (1973). Other courts have awarded prejudgment interest when the plaintiff's claim was certain but subject to an uncertain counterclaim. *E.g., Fluor Corp. v. United States ex rel. Mosher Steel Co.*, 405 F.2d 823 (9th Cir.), *cert. denied*, 394 U.S. 1014, 89 S.Ct. 1632, 23 L.Ed.2d 40 (1969). Needless to say, the difference between two amounts, one of which is uncertain, is itself uncertain.

2. Courts and commentators have severely criticized the liquidated-unliquidated distinction for decades. *Funkhouser v. Preston Co.*, 290 U.S. 163, 168, 54 S.Ct. 134, 136, 78 L.Ed. 243 (1933) ("a distinction ... simply as between cases of liquidated and unliquidated damages, is not a sound one"); *Moore-McCormack Lines, Inc. v. Richardson*, 295 F.2d 583, 594 (2d Cir.1961) ("the hoary distinction"), *cert. denied*, 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526, *cert. denied*, 370 U.S. 937, 82 S.Ct. 1577, 8 L.Ed.2d 806 (1962);

however, and preserve the distinction in all its pristine purity, long-established principles of law make it inapplicable to this case.

## II.

This is not a case in which La Paz sought to recover damages because Yuma had breached a contract or committed a tort. In those types of cases, it might make sense to deny prejudgment interest on the grounds that the defendant could not know what sum to tender and thus could not halt the running of interest. This is the so-called "protection" theory. Comment, *Prejudgment Interest: Survey and Suggestion*, 77 NW.U.L.REV. 192, 197 (1982) (citing cases). In this case, however, Yuma actually had possession of La Paz's property and is now returning that property by paying its worth in money. Thus, the judgment in this case does not represent damages in contract or tort; it represents *restitution* of property or its value.

Prejudgment interest is particularly appropriate in restitution cases because interest is the value of money or property over time and is properly payable when the owner has been deprived of the use of his property or money. D. DOBBS, HANDBOOK ON THE LAW OF REMEDIES § 3.5, at 169–70, 173 (1973). Consequently, even if the dichotomy between liquidated and unliquidated damages is recognized, it is logically irrelevant in this type of case. As Professor Dobbs has explained:

> If the plaintiff *has actually lost the use* of his money, or the use of any other form of property, and if compensation is the goal of damages, he should be entitled to interest or some other measure of his loss whether the exact sum due him

as principal is ascertainable or not. It is no more unfair to the defendant to hold him for interest on a sum he could not ascertain in advance than it is to hold him for the unascertainable sum itself, if interest does indeed measure the plaintiff's loss of use of the money or property.

D. DOBBS, *supra* § 3.5, at 173 (emphasis added); *accord* T. SEDGWICK, A TREATISE ON THE MEASURE OF DAMAGES § 300 (A. Sedgwick & J. Beale, eds. 9th rev. ed. 1920).

The present case clearly illustrates the irrelevancy of the liquidated-unliquidated distinction in restitution cases. Under A.R.S. § 11–148, La Paz was entitled to its proportionate share of assets as of the time of its organization, January 1, 1983. As is now established by judgment, on that date Yuma had in its possession assets—including cash and personal and real property valued at over two million dollars—which belonged to La Paz. For more than four years Yuma has used those assets, obtaining value from the use of La Paz's property, perhaps even collecting interest on La Paz's cash. The court now compels Yuma to pay La Paz only the same amount of money that was due on January 1, 1983. This award is not complete restitution because La Paz has been deprived of and Yuma has benefited from the use of La Paz's share of county assets during the period of litigation. Interest is the means of measuring Yuma's gain and La Paz's loss. D. DOBBS, *supra* § 3.5, at 168–69. Theoretically, the money and property used by Yuma during the period of litigation has produced the exact amount which should now be due as prejudgment interest. *Id.*

State v. Phillips, 470 P.2d 266, 273 (Alaska 1970) ("the liquidated-unliquidated common law distinction lacks a persuasive rationale"); T. SEDGWICK, A TREATISE ON THE MEASURE OF DAMAGES §§ 299, 300, at 569–71, § 315, at 624–26 (A. Sedgwick & J. Beale, eds. 9th rev. ed. 1920); D. DOBBS, *supra* § 3.5, at 164–74. In addition to the problem explained in text, the more persuasive criticisms include the treatment of plaintiffs suffering identical losses in different ways based solely on whether their claims are liquidated, *see* Comment, *Prejudgment Interest: Survey and Suggestion*, 77 NW.U.

L.REV. 192, 199 (1982), and the failure to recognize the truism that interest represents the value of money over time, T. SEDGWICK, *supra* § 300, at 571 ("once admit that interest is the natural fruit of money, it would seem that whenever a verdict liquidates a claim and fixes it as of a prior date, interest should follow from that date"). For a complete summary of the criticism, *see* Comment, *supra*, 77 NW.U.L.REV. at 192; *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 552–54 (Texas 1985) (summarizing and approving modern trend recognizing prejudgment interest).

Contrary to the basic premise of the court's opinion, prejudgment interest is not awarded simply because the amount due is certain nor withheld because it is uncertain. When, as here, the plaintiff's claim is measured by the value of the use of its property or its right to restitution for the taking of its property, interest is awarded because the plaintiff was entitled to compensation before the day judgment was formally entered and has lost the value of that compensation from the time of loss until the time of judgment. In simple terms, Yuma took two million dollars of La Paz's property and is now paying it back. Suppose, instead of holding and using that property, Yuma had sold it for cash and invested the two million dollars in a certificate of deposit. The majority holds, in effect, that Yuma must now give back the money but may retain the interest it made on La Paz's money. This result is incorrect. La Paz is entitled to both its money and the value of the use of its money and property from January 1, 1983.

By failing to award interest, the majority makes it more profitable for one in possession of another's assets to hold and use those assets instead of delivering them to their rightful owner. This makes it more profitable to convert than to account.