819 P.2d 943

**DKI CORPORATION/SYLVAN POOLS, Petitioner–Employer,**

**National Union Fire Insurance of Pittsburg, Petitioner–Carrier,**

v.

**The INDUSTRIAL COMMISSION OF ARIZONA, Respondent,**

**Abel Millanez, Respondent–Employee.**

No. 1 CA–IC 89–024.

Court of Appeals of Arizona, Division 1, Department B.

Jan. 17, 1991.

Reconsideration Denied April 24, 1991.

Review Granted Nov. 5, 1991.

Joseph L. Moore, Ltd., Phoenix, for petitioners.

Anita R. Valainis, Chief Counsel, Indus. Com'n of Arizona, Phoenix, for respondent.

Cecil A. Edwards, Jr., Phoenix, for respondent-employee.

## OPINION

GRANT, Chief Judge.

This is a special action review of an Industrial Commission award granting reopening and awarding interest on unpaid temporary disability benefits from the filing date of the petition to reopen. Petitioners present three issues. First, whether a claimant's conduct violating medical restrictions constitutes an affirmative defense on reopening. Second, if not, whether claimant carried his burden of proving that his conduct was reasonable. Third, if reopening was proper, whether the Administrative Law Judge erroneously awarded interest from the date of the filing of the petition to reopen. For the reasons which follow we affirm the award.

## FACTS AND PROCEDURAL HISTORY

Claimant worked for several years constructing pools. In approximately 1970, while working for an employer other than petitioner, claimant first suffered an injury to his lower back for which he underwent surgery for a herniated disc at the L5–S1 level. His claim on this injury was ultimately closed with a 5% permanent impairment but no disability because he had returned to regular work.

In April 1982, while working for petitioner employer (DKI), claimant again injured his lower back. Petitioner carrier (National) accepted compensability, and orthopedic surgeon Samuel Kaplan, M.D., became the treating physician. Subsequently, Dr. Kaplan also performed surgery for a herniated disc at the L5–S1 level. On October 15, 1982, Dr. Kaplan wrote to Hubbard F. Fellows, M.D., regarding claimant's progress:

The patient has had an excellent recovery. Now gets occasional leg discomfort with prolonged sitting, but basically feels

that his surgery has been of significant benefit. At this point the patient is enrolled in a vocational rehabilitation program so as to avoid heavy lifting or prolonged bending and stooping. In my opinion, his orthopedic condition is currently stable. I do not believe he needs further orthopedic follow-up at this point and have dismissed him to the restricted work duty outlined in my report to the Industrial Commission,[1] and have established a 5% permanent partial impairment for the whole man.

On November 9, 1982, the Industrial Commission awarded claimant up to $5,995.00 for training as an electronics technician. In November 1983, claimant successfully completed the training program. National issued a notice terminating temporary benefits with a permanent impairment in March, 1984. In July of the same year, the Industrial Commission issued an award for permanent partial disability based on claimant's earning capacity as an electronics technician. In September 1986, Dr. Fellows again referred claimant to Dr. Kaplan, who reported as follows:

[Claimant] ... underwent re-exploration laminectomy in 1982. The patient had his original disc removal approximately ten years prior as an on-the-job injury. At any rate, in the postoperative period the patient did well in that his leg dysesthesia totally vanished. He was retrained to do electronic work but has never obtained a job in that field. He has done odd jobs on-and-off since that time.

In the last year the patient has had increasing low back pain and only recently has had increasing discomfort in the left buttock and upper thigh area. Sitting his worst position; lying down is best. The patient denies any weakness.

. . . .

The patient appears to have definite mechanical back pain which I believe is directly related to previous industrial back injuries and surgeries. I recommend

---

1. The certified claims file does not include the report to the Commission referred to in Dr. Kaplan's note. The file does include a July 1982

release to light work restricting lifting over twenty pounds and prohibiting prolonged bending, stooping, and sitting.

that the case be reopened. My plan will be, once approval is obtained, to repeat the patient's facet injections.... If this is not helpful, the possibility of low back fusion will be entertained.

Claimant subsequently formally petitioned to reopen, and National granted this petition.

Dr. Kaplan provided conservative care. On November 24, 1986, he noted that claimant reported partial improvement, had found work in a cabinet factory, and had been playing golf. Dr. Kaplan recommended that claimant avoid sports activity and heavy lifting. On December 22, 1986, Dr. Kaplan reported that claimant was "doing very heavy work; lifting pianos, moving furniture, etc. He is functioning with minimal discomfort. At this point his condition is stable.... Full work duty established." Dr. Kaplan also recommended supportive care in the form of medication and treatment as needed. National subsequently authorized the recommended supportive care and also terminated temporary benefits without additional permanent impairment. In July 1987, claimant found work as a golf course groundskeeper.

On August 14, 1987, the Industrial Commission awarded claimant the same permanent partial disability benefits because his physical condition was unchanged. Claimant timely protested this award, and a hearing was initially scheduled for December 17, 1987.

On November 17, 1987, claimant returned to Dr. Kaplan complaining of increased left leg pain. Comparative x-rays revealed a narrowed L5–S1 disc space. Claimant did not respond to conservative treatment. On December 2, 1987, Dr. Kaplan recommended reopening of the claim. On January 19, 1988, claimant formally petitioned to reopen. On February 8, 1988, National denied this petition without specifying a reason. Claimant timely protested this denial.

Meanwhile, the pending hearing on permanent disability had been transferred to another Administrative Law Judge and the hearing date continued until May 3, 1988. Claimant subsequently suggested that the parties use the scheduled hearing to litigate reopening. The Administrative Law Judge convened a prehearing conference on March 10, 1988, at which the parties agreed to litigate reopening only. National did not mention any issue concerning claimant's conduct. After the prehearing conference, claimant did not propound additional interrogatories to National.[2] Claimant, however, did file a claim for bad faith claims processing and requested an award of interest on any retroactive compensation.

At the first scheduled hearing on May 3, 1988, claimant alone appeared. He stated that by November, 1987, his back and left leg pain had gradually worsened to the extent that he could no longer sit or drive. He testified that maintenance work at the golf course had involved mostly sitting and driving a mower. Although his symptoms had increased while doing this work, claimant did not believe that the work had caused the increased symptoms. He also stated that he had similar symptoms driving or lifting at home. Because of these symptoms, claimant stopped working on December 16, 1987, and subsequently underwent a third surgery. Claimant acknowledged that he had been retrained as an electronics technician, but stated that he had never been employed in this capacity. Again at this hearing, National failed to mention any issue concerning claimant's conduct.

On September 22, 1988, orthopedic surgeon Gerald C. Moczynski, M.D., and neurosurgeon Arnold B. Calica, M.D., the current treating physician, testified. Dr. Moczynski, who had evaluated claimant in April 1988 and subsequently had reviewed a myelogram report, stated that new disc material had impinged upon the S1 nerve root. In his opinion, the 1970, the 1982, and the current herniation were a continuum of the same defect in the annulus. Dr. Moczynski also testified that the current condition was partially related to the 1982 injury.

**2.** Claimant had propounded interrogatories concerning permanent disability, which National had failed to answer until the day before the original scheduled hearing.

Dr. Calica first examined claimant in January, 1988, and performed surgery on May 18, 1988, to remove a disc fragment in the canal impinging on the nerve root. Dr. Calica testified that he could only speculate about the cause of the current condition. In particular, Dr. Calica could not exclude the possibility that the current condition was a new injury unrelated to the 1982 injury. He acknowledged, however, that the 1982 injury could have contributed to the current condition.

Dr. Kaplan appeared at the final hearing on October 25, 1988. He testified that he had recommended reopening in December, 1987, because claimant's condition had worsened and required active treatment. In his opinion, this change was at least partially related to the 1982 injury.

On cross-examination, National's attorney questioned Dr. Kaplan about the restrictions he had imposed on claimant in October, 1982. Although Dr. Kaplan could not recall exactly what he had told claimant, he testified that he normally told patients to avoid repetitive lifting over thirty pounds, lifting over seventy pounds, and prolonged standing and sitting. He recalled that claimant had been retrained as an electronics technician and agreed that the reason for this rehabilitation was to avoid "the kinds of strains and trauma that had gotten him into problems in the first place[.]" Dr. Kaplan was then asked whether the work that claimant had actually done was consistent with the restrictions he had imposed. When the administrative law judge questioned petitioner's attorney as to the relevance of this testimony, the following exchange took place:

MR. MOORE: [Petitioner's attorney] It would be based upon the reasonableness of the activity that Mr. Millanez was involved in in November of 1987 which gave rise ... to the new problems that existed.

JUDGE GHAREEB: Is that a factor in reopening?

MR. MOORE: I think it is, assessing the reasonableness of that conduct.

MR. EDWARDS: [Respondent's attorney] First, I don't know, I'd have to go back and look at the record concerning what Dr. Calica said. But as far as the activities of whatever Abel was doing in the latter part of 1987 at or about the time that Dr. Kaplan says that the claim should have been reopened, I submit that there isn't any evidence on that.

What is he supposed to have done that's so ridiculous he violated the good doctor's orders?

MR. MOORE: Your Honor, speaking to that, I think it's that Mr. Millanez has acknowledged that he went back to work as groundsman at a golf course, which involved elements of the kind of physical activity that Dr. Kaplan has indicated that in the conference with Mr. Millanez he admonished him not to do, and that that, and I think as you recognize and Dr. Calica's testimony, he felt that that was a reasonable possibility, that that contributed to the problem or that was the cause of it.

Finally, Dr. Kaplan was questioned about the relationship between the new disc fragment and claimant's exertions beyond the limits that Dr. Kaplan had imposed:

Mr. MOORE: All right. And that new occurrence would be compatible with, in terms of its etiology, with exertional activity that would have been beyond the bounds that you had discussed with [Mr. Millanez] at the time?

Dr. KAPLAN: Yes.

The parties submitted post-hearing memoranda. National focused on the reasonableness issue, arguing that claimant had the burden of proving that his conduct was reasonable and that he had failed to sustain this burden because he had done heavy work in violation of the restrictions that Dr. Kaplan had imposed.

The Administrative Law Judge then issued an award without addressing the reasonableness issue. He merely found a medical conflict and resolved it in favor of Dr. Kaplan's testimony that claimant had a new or additional condition partially related to the 1982 injury. He also awarded interest on temporary disability benefits effective January 19, 1988.

In its request for review, National reiterated its argument about reasonableness and also asserted that the Administrative Law Judge had failed to make a material finding regarding this issue. Claimant responded by asserting, among other arguments, that National had untimely asserted the defense of unreasonable conduct and also had failed to prove that claimant's work at the golf course contributed to his current condition.

The Administrative Law Judge then issued a decision upon review modifying the award. He added a finding that Dr. Moczynski's testimony also supported reopening. He also added the following finding concerning claimant's conduct.

16. It is the insurance carrier's assertion that certain of applicant's conduct gave rise to his "recurrent pathology" when in his physical condition he engaged in certain work activities while employed at a golf course; however, the evidence failed to establish that applicant actually reinjured himself while working at the golf course or that the activities in which [he] engaged produced the conditions of which he now complains. The medical testimony failed to establish that applicant's engaging in certain activities produced the symptoms and complaints for which reopening was sought, even though the doctors stated that such activities may have been medically contraindicated. Moreover, it should be noted that the insurance carrier failed to assert the defense at the first scheduled hearing but rather waited to make such assertion until a third hearing convened to obtain the testimony of a medical doctor.

National then brought this special action—Industrial Commission.

## DISCUSSION

### A. *Affirmative Defense Issue.*

On review, National first asserts that the Administrative Law Judge erred by characterizing the alleged unreasonableness of claimant's conduct as an affirmative defense. We disagree. Further we conclude that National waived this defense by failing to timely assert it. Accordingly, we need not address the petitioners' second issue which is based on the assumption that claimant had the burden of proving his conduct reasonable.

The test as followed in Arizona for determining the compensable consequences of an industrial injury is enunciated in 1 A. Larson, *Workmen's Compensation Law* § 13.11 at 3–502 (1990). According to Larson, there is a distinction between the test for determining the compensability of the initial injury and that for determining how far the range of compensable consequences of that injury may be carried. *Id.* Larson enunciates this distinction as follows:

> As to the primary injury, ... the employee's own *contributory negligence* is ordinarily not an *intervening cause* preventing initial compensability. But when the question is whether compensability should be extended to a subsequent injury or aggravation related in some way to the primary injury, the rules that come into play are essentially based upon the concepts of "direct and natural results," and of claimant's own conduct as an *independent intervening cause.*

*Id.* (footnotes omitted) (emphasis added).

One unsettled question under the compensable consequences test, however, is whether the claimant has the burden of proving that his conduct was reasonable or whether the carrier must prove unreasonable conduct. This court, in fact, has recognized but reserved this question in *Klosterman v. Industrial Comm'n*, 155 Ariz. 435, 747 P.2d 596 (App.1987):

> [T]he administrative law judge failed to make a finding on the second element of the compensable consequences test, i.e., the reasonableness or unreasonableness of the claimant's activities which precipitated the subsequent reinjury....

The parties neither argued at the Industrial Commission nor have raised before this court the issue of whether the claimant has the burden of proving that his frisbee activities were reasonable or whether the carrier has the burden of proving that such activities were unrea-

sonable. Because this issue was not raised, we do not address it.

*Id.* at 437–38, 747 P.2d at 1060–61.

Larson does not directly address this burden of proof question. In fact, his test contains language with somewhat contradictory implications as to where the burden lies. On the one hand, Larson refers to a claimant's conduct as "contributory negligence." Larson, *supra.* Later, however, when discussing the extension of compensability beyond the primary injury, Larson refers to a claimant's conduct as "an independent intervening cause." *Id.*

■ Contributory negligence unquestionably is an affirmative defense that a defendant must plead and prove. *Pearson & Dickerson Contractors v. Harrington,* 60 Ariz. 354, 362, 137 P.2d 381, 385 (1943); *see also Lakin Cattle Co. v. Engelthaler,* 101 Ariz. 282, 419 P.2d 66 (1966) (affirmative defense must be pleaded and proved by defendant). The concept of intervening cause, however, has alternately been characterized as a possible affirmative defense, and, at other times, as an element of proximate causation which is part of the plaintiff's burden of proof. *See, e.g., Stroud v. Dorr–Oliver, Inc.,* 112 Ariz. 403, 542 P.2d 1102 (1975) (characterizing superseding intervening negligence of third party as defense); *Knight v. Miller,* 503 So.2d 120, 124 (La.App.1987) (burden on plaintiff to show that aggravation not the result of distinct intervening act for which defendant not responsible); *Rossell v. Volkswagen of America,* 147 Ariz. 160, 168, 709 P.2d 517, 525 (1985) (assuming that plaintiff had the burden of proving that third party's act was not superseding cause); *see also generally* 57A Am.Jur.2d Negligence §§ 591, 602, 680 (1989). The question before us, therefore, is whether the claimant's alleged unreasonable conduct should be treated as the affirmative defense of contributory negligence (with the burden on petitioner to show unreasonable conduct) or as an element of proximate causation (with the burden on claimant to show reasonable conduct).

■ As stated previously, Larson does not specifically state that a claimant's al-leged unreasonable conduct is to be asserted as contributory negligence; nevertheless, we believe he can be interpreted to mean just that. First, Larson unambiguously states that an "employee's own contributory negligence ... ordinarily ... will [not constitute] an intervening cause preventing initial compensability." Larson, *supra.* The ambiguity arises in the next sentence, however, in which Larson discusses the question of when compensability should be extended beyond the primary injury. In this latter context, Larson states that compensability beyond the initial injury is "based upon the concepts of direct and natural results, and of claimant's own conduct as an independent intervening cause." *Id.* In our opinion, Larson intends that the claimant's own conduct—in either context—should be treated as possible contributory negligence. The distinction he makes is not whether such conduct in fact constitutes contributory negligence, but whether it affects compensability. Thus, according to Larson, a claimant's negligence which contributes to the primary injury will not prevent initial compensability, whereas subsequent contributory negligence may prevent the extension of compensability to a later "injury or aggravation related in some way to the primary injury." *Id.*

We hold, therefore, that a claimant's allegedly unreasonable conduct which may affect the extension of compensability beyond the primary injury should be asserted by the employer as contributory negligence. Furthermore, since contributory negligence constitutes an affirmative defense, the burden of proof lies with the one asserting it. *Pearson & Dickerson, supra; Lakin Cattle Co., supra.*

In further support of our interpretation, we note that a claimant satisfies his burden of proof for reopening by establishing "a new, additional or previously undiscovered ... condition and a causal relationship between the new disability and the prior industrial injury." A.R.S. § 23–1061(H); *Sneed v. Industrial Comm'n,* 124 Ariz. 357, 359, 604 P.2d 621, 623 (1979). Thus, once a claimant has satisfied this burden,

the burden then shifts to the employer or carrier to establish that the aggravation or injury is nevertheless noncompensable because it is the result of the claimant's unreasonable conduct.

We hold therefore, that the Administrative Law Judge properly characterized the alleged unreasonableness of claimant's conduct as an affirmative defense. National thus had the burden both to assert the defense and to prove that claimant's conduct was unreasonable.

■ Furthermore, because an affirmative defense is waived if not timely asserted, we conclude that petitioner, by failing to assert this defense prior to the third scheduled hearing, effectively waived the defense as a matter of law. *See Magma Copper Co. v. Industrial Comm'n*, 139 Ariz. 38, 48–49, 676 P.2d 1096, 1106–07 (1983) (employer or carrier who intends to raise an affirmative defense must give notice sufficient to enable the worker to produce evidence on that issue); *Hughes Aircraft Co. v. Industrial Comm'n*, 125 Ariz. 1, 4, 606 P.2d 819, 822 (App.1979) (failure to plead affirmative defense results in waiver of defense). Based on the foregoing, we need not address the second issue presented by petitioner which assumes that claimant had the burden of proving that his conduct was reasonable.

B. *Interest on Unpaid Temporary Disability.*

■ We turn then to the third issue, which concerns the award of interest on unpaid temporary disability benefits effective as of the filing date of the petition to reopen. Because the Administrative Law Judge relied on *Tisdel v. Industrial Comm'n*, 156 Ariz. 211, 751 P.2d 527 (1988) in making this award, our analysis begins with this case.

In *Tisdel*, the claimant injured a knee at work and subsequently was medically discharged with a 10% lower extremity impairment, a scheduled disability. The carrier relied on this discharge to terminate temporary benefits. Although the carrier indicated that it would issue another notice

concerning permanent disability, it inadvertently failed to do so. The unrepresented claimant, who returned to regular work, made no further inquiry. Some thirteen years later, he suffered another industrial injury and retained counsel, who discovered the mistake. Claimant then demanded payment of both scheduled disability benefits[3] and interest. The carrier acknowledged by letter that claimant should have been paid scheduled disability benefits based upon a 10% lower extremity impairment. Several months later, it paid this benefit to claimant. The matter then proceeded to a hearing on the issue of interest.

The Administrative Law Judge denied interest because the Workers' Compensation Act does not specifically authorize an award for interest. The court of appeals set aside this award. It concluded that A.R.S. § 44-1201, the general interest statute, which specifies the rate of interest for "any legal indebtedness," applied to a permanent disability award because A.R.S. § 23-952 requires payment even if further review is sought. It also concluded that interest accrued, that is, the right to benefits became a legal indebtedness, when the carrier acknowledged that it had mistakenly failed to pay the scheduled award. *Tisdel v. Industrial Comm'n*, 155 Ariz. 438, 440–41, 747 P.2d 599, 601–02 (App.1988). The supreme court vacated the court of appeals' opinion. It agreed that specific authorization within the Workers' Compensation Act for the payment of interest was unnecessary. *Tisdel*, 156 Ariz. at 212–13, 751 P.2d at 528–29. It disagreed, however, that interest first accrued when the carrier discovered its mistake. Rather, the court concluded that interest accrued when the carrier terminated temporary benefits, the date it "had notice of its obligation to pay permanent benefits." *Id.* at 213, 751 P.2d at 529 (footnote omitted). Citing A.R.S. § 23-1047[3] and cases from several jurisdictions, the court reasoned as follows:

> Interest is not based on diligence or lack of diligence. Interest accrues and be-

---

**3.** The court regarded A.R.S. § 23-1047 as "helpful" even though, by its terms, it does not apply to scheduled disability benefits except those pay-

able for disfigurement under A.R.S. § 23-1044(B)(22).

comes payable when the debt is due. In this case the carrier has had the use of the money since December of 1971. We do not feel it unjust to require the carrier to pay interest on an award it should have paid 13½ years ago. The money rightfully belonged to the claimant. He not only lost the use of the money when the carrier failed to pay the award, but also the "time-value" of the money. As the Alaska Supreme Court further noted: "This court recognizes the economic fact that money awarded for any reason is worth less the later it is received." *Land & Marine Rental Co. v. Rawls,* 686 P.2d 1187, 1191 (Alaska 1984) (citing *Farnsworth v. Steiner,* 638 P.2d 181, 184 (Alaska 1981)); *Accord Drake v. Norge Div. Borg Warner Corp.,* 367 Mich. 464, 468, 116 N.W.2d 842, 844 (1962) ("Unless interest is charged for past due benefits awarded, the employee inevitably will receive less than he is entitled to receive. By the same token, unless interest is charged for past due benefits awarded, the employer will have had the free use of money determined to have been due the employee.")

When the carrier fails to timely pay a claimant's compensation, we do not believe it is contrary to the spirit of the Worker's Compensation Act to require interest from the date the benefits were due.

*Id.* 156 Ariz. at 214, 751 P.2d at 530.

National argues that *Tisdel* is distinguishable in fact and inapplicable in principle to the present case. The factual distinctions must be acknowledged. *Tisdel* involved *mistakenly* unpaid permanent scheduled disability benefits. In the current case, National has disputed liability in good faith. Further, the benefits involved here are for temporary disability and such benefits vary proportionately with earning capacity. *See, e.g., Felker v. Industrial Comm'n,* 134 Ariz. 19, 653 P.2d 369 (App. 1982). Finally, a determination of the amount of temporary benefits is not ripe

for administrative processing until liability is finally determined.[4]

Despite these distinctions, we conclude that *Tisdel* supports the award of interest in the present case. Although the carrier in *Tisdel* mistakenly failed to pay benefits, the award of interest was not based on fault, but on the use of money owed to another. *Tisdel,* 156 Ariz. at 214, 751 P.2d at 530. Similarly, National's good faith in disputing reopening is irrelevant to the obligation to pay interest. It has had the use of the money owed to claimant. This extension of *Tisdel* is consistent with the general rule that disputes as to liability do not insulate a defendant from prejudgment interest. *See, e.g., La Paz County v. Yuma County,* 153 Ariz. 162, 168, 735 P.2d 772, 783 (1987).

Two of the cases cited in *Tisdel* reinforce this conclusion. In the first, *Land and Marine Rental Co. v. Rawls,* 686 P.2d 1187 (Alaska 1984), the claimant sought an adjustment of his claim, a procedure analogous to reopening, for a new condition allegedly related to the industrial injury. The carrier disputed causation, but adjustment was ultimately awarded. On appellate review, the court awarded interest from the date that adjusted benefits should have been paid. *Id.* at 1192. In the second, *Drake v. Norge Div. Borg Warner Corp.,* 367 Mich. 464, 116 N.W.2d 842 (1962), the court awarded interest from the date of disability even though the claim was not actually filed until several years later.

We cannot agree that *Tisdel* applies only to permanent awards. Although the permanent character of the award was essential to the rationale of the court of appeals, the supreme court did not rely on A.R.S. § 23–952, which applies only to permanent awards, and only incidentally relied on A.R.S. § 23–1047(A). *Tisdel,* 156 Ariz. at 213, 751 P.2d at 529.

Finally, we disagree that the recovery of interest applies only to scheduled disability awards. If the supreme court had intended

---

**4.** *The delay involved nevertheless is substantial.* Claimant filed the petition to reopen on January 19, 1988. The award was issued on December 27, 1988, nearly a year later. The case was heard before the court of appeals on January 17, 1990. A further delay attends this court's ultimate disposition, with potential review by the supreme court to follow.

such a narrow limitation, presumably the *Tisdel* opinion would have included this explicit restriction. Instead, the court used language and cited authority implying that interest would be due on any unpaid benefit. We recognize the general civil rule that prejudgment interest is not allowed on unliquidated damages. *See, e.g., United California Bank v. Prudential Ins. Company of America,* 140 Ariz. 238, 310, 681 P.2d 390, 462 (App.1983). In our opinion, although temporary disability benefits vary with earning capacity, they are liquidated within the meaning of this rule because both the right to recover and the amount of recovery are fixed by statute. *See generally* A.R.S. §§ 23–1044–1045(A).

For the foregoing reasons, we affirm the award.

LANKFORD, J., concurs.

JACOBSON, P.J., dissents in part and concurs in part with opinion.

JACOBSON, Presiding Judge, dissenting in part, concurring in part.

I dissent only from that portion of the majority opinion granting interest from the date of reopening. As to the other issues dealt with in the majority opinion, I concur.

My divergence with the majority on the interest issue is a narrow one and stems from what I perceive is a misapplication of A.R.S. § 44–1201, the general interest statute. In *Tisdel v. Industrial Commission,* 156 Ariz. 211, 213, 751 P.2d 527, 529 (1988), the supreme court held that the general interest statute, which allows for interest on a legal indebtedness, authorizes an award of interest on workers' compensation benefits not timely paid. However, nothing in *Tisdel* intimates that a workers' compensation "indebtedness" should be treated differently from any other legal indebtedness incurred in a commercial transaction or by virtue of a tort liability. While *Tisdel's* holding clearly is not limited to permanent scheduled disability awards, the *Tisdel* claim nevertheless was readily capable of mathematical computation as to

the amount of benefits owed by the carrier.[5] In short, the claim in *Tisdel* was liquidated.

Unfortunately, such is not the case here. The filing of a petition to reopen does not, in and of itself, establish the amount of compensation due a claimant. Upon reopening, assuming it is granted, compensation depends on a number of factors: (1) whether the reopening results in a determination of loss of earnings and, if so, the amount thereof; (2) whether the reopening results in a determination of additional disability and, if so, the amount thereof; and (3) whether the disability, if found, results in a loss of earning capacity and, if so, the amount thereof. This third factor, if no other, is a highly subjective determination, depending on how much, if anything, the claimant is able to earn on the open labor market with an industrially-caused disability. *See generally Roach v. Industrial Comm'n,* 137 Ariz. 510, 672 P.2d 175 (1983) (test in determining loss of earning capacity is whether employment reasonably is available that the claimant could reasonably be expected to perform; substantial or competent evidence required with regard to each part of the test). Admittedly, the award in this case involved interest on temporary disability benefits, but even temporary benefits can run the gauntlet from total to partial, with the amount of compensation varying between the two. *See* A.R.S. §§ 23–1044 and –1045.

The majority recognizes that prejudgment interest is not allowed on unliquidated claims. *United California Bank v. Prudential Ins. Co. of America,* 140 Ariz. 238, 310, 681 P.2d 390, 462 (App.1983). The reasoning underlying this requirement of liquidation is essentially one of fairness: before a debtor, who has not agreed to pay interest, is required to do so, he must be given the opportunity to pay the debt and avoid the interest. If the amount of the debt is unknown, the debtor is not afforded this opportunity. *See Schwartz v. Schwerin,* 85 Ariz. 242, 250, 336 P.2d 144, 149 (1959); *Cockrill v. Cockrill,* 139 Ariz. 72,

---

**5.** Tisdel was found to be stationary with a 10% functional loss of the lower extremity which, based upon Tisdel's average monthly wage, entitled him to five months of permanent compensation at the rate of $415.18 per month, or $2,075.90. 156 Ariz. at 212, 751 P.2d at 528.

75, 676 P.2d 1130, 1133 (App.1983); *Fogleman v. Peruvian Assocs.*, 127 Ariz. 504, 507, 622 P.2d 63, 67 (App.1980), *overruled in part on other grounds, Fleming v. Pima County*, 141 Ariz. 149, 685 P.2d 1301 (1984).

Contrary to the majority's conclusion, this claim is not made liquid merely because the right to recover and the theoretical amount of recovery are fixed by statute. Rather, I believe that this claim is unliquidated because the carrier cannot know, when the petition to reopen is filed, where within the statutory range of temporary disability benefits the claimant's case will fall. In my opinion, this claim for compensation is not sufficiently mathematically certain so as to afford the carrier the opportunity to pay it and avoid the interest. This uncertainty relieves the carrier from the payment of interest.

I would set aside the award on this basis only.